[No. 40913.     En Banc.     May 27, 1971.]

THE CITY OF SPOKANE, *Respondent*, v. PETER J. McDONOUGH, *Appellant*.

*Fredrickson, Maxey, Bell & Allison, Carl Maxey,* and *Gordon L. Bovey,* for appellant.

*Norman dePender, John O. McLendon,* and *Frederic G. Fancher,* for respondent.

ROSELLINI, J.—The defendant was charged with disor-

derly conduct as defined in Spokane City Ordinance No. C1377, § 3. His conviction in the Spokane Municipal Court was confirmed on appeal to the superior court in a trial to the court without a jury. The defendant now appeals the superior court judgment and sentence. He challenges the sufficiency of the evidence, claims unconstitutional vagueness in the ordinance, and asserts abridgment of his constitutional rights to freedom of speech.

The case comes here with an unique feature: a sound film, taken at the rally and put into evidence at trial, shows most of the transaction upon which the conviction rested. The defendant's statement of the case in his brief adopts the film as a complete account of the operative facts; respondent city, in its counterstatement of the facts, accepts "in general Appellant's Statement of the Case" and thus adopts the film, too, as a statement of the case. Consequently, we are in the same position as was the trial court in viewing the evidence.

Several thousand people had gathered at the Parkade Plaza in downtown Spokane at a political rally to hear Mr. Spiro Agnew, the Republican vice-presidential candidate. The defendant, a senior at Gonzaga University, stood among a group of spectators near the railing on what could be described as a balcony or second-story walkway located above the plaza area. Mr. Agnew was well into his speech when defendant shouted "Warmonger." Looking up, Mr. Agnew inquired, "Who said that?" and the defendant, moving to the balcony railing and looking down at the speaker, called, "I said it," giving the current peace sign by making a "V" with his fingers, and adding, "What the hell do you think this means?" By then, a police officer, stationed on the balcony, had reached defendant's side and placed him under arrest.

Spokane City Ordinance No. C1377, § 3, under which the complaint was filed, reads:

> Every person who shall on any street, sidewalk, alley, or public place, or in or upon any private house, building or premises, act in a noisy, riotous or disorderly manner, or use any profane, obscene or abusive language, or do

any indecent or immoral act tending to debauch the public morals, or do any act tending to disturb the public peace, shall be guilty of a misdemeanor.

The complaint charged that defendant acted in a noisy, riotous and disorderly manner, used abusive language and committed acts tending to disturb the public peace.

We need not consider the defendant's contentions that the ordinance is void for vagueness or that it is violative of the First Amendment right of free speech, inasmuch as we are convinced that the defendant's words did not constitute disorderly conduct under the circumstances.

Giving the ordinance a reasonable interpretation, we do not conceive that it was intended to prohibit conduct which is customarily considered acceptable at events of the type at which it occurs, assuming the event itself is lawful.

The evidence, including the film viewed by this court, showed that the political rally was a noisy and partisan event. There were banners and slogans and shouting.

On such an occasion, where an open-air crowd is tacitly invited to demonstrate its approval of the speaker and his party through applause, cheers and friendly expletives, it is to be expected that those of opposing views in the audience are likely to convey vociferously their disapproval in an orderly but vocal way. Shouting the word "Warmonger" but once—without more to indicate a further purpose or intention of breaking up the meeting, or to deprive the speaker of his audience, or to interfere with the rights of others to hear, or the speaker to speak—did not amount to a disturbance of the peace, in fact or in law.

The judgment is reversed and the prosecution dismissed.

HAMILTON, C.J., STAFFORD, J., and HILL and DONWORTH, JJ. Pro Tem., concur.

HALE, J. (concurring specially)—The court's opinion reminds me of Scopes' case in Tennessee. John Thomas Scopes, a high school biology teacher, was convicted of teaching the theory of evolution in a public high school, a theory which denied the Biblical story of man's Divine

Creation and taught that man had descended from a lower order of animals. The trial judge—not the jury—imposed a fine of $100 and Scopes, challenging the constitutionality of the anti-evolution statute, appealed. Holding that the court had exceeded its jurisdiction in imposing the $100 fine—fines in excess of $50 in such cases being exclusively for the jury—the Supreme Court of Tennessee ordered a nolle prosequi of the prosecution, but, nevertheless, proceeded to determine the constitutionality of the statute. *Scopes v. State*, 154 Tenn. 105, 289 S.W. 363, 53 A.L.R. 821 (1927), and 152 Tenn. 424, 278 S.W. 57 (1925). Merits aside, that court, I think, did well to reach the question of constitutionality in Scopes' case; we should resolve the same issues in young McDonough's case.

McDonough was convicted both in municipal court and in superior court of violating Spokane's disorderly conduct ordinance. To decide merely whether he should in law be relieved of the onus of a conviction for a minor offense, or pay a fine or, perhaps, get a deferred or suspended sentence does not resolve the real issues of this appeal. In limiting our review to an evaluation of McDonough's behavior, we miss the primary issue before us which is to test the constitutionality of the Spokane ordinance, vis-a-vis the constitutional guarantees of freedom of speech, peaceable assembly and reasonable certainty of declaring the law.

It would have been a disappointment to young McDonough, I think, had he been acquitted on the facts in either Spokane Municipal Court or in the superior court. His perfunctory motion for dismissal at the close of the city's case in superior court, without summary or analysis of the evidence or argument on the law,[1] coupled with counsel's lucid and analytic exposition of the constitutional issues in this appeal persuades me that, even though defendant's behavior, in my judgment, did not quite reach the point proscribed by the ordinance, his contentions that the ordi-

---

[1] "Mr. Maxey: I move to dismiss, your Honor. At this stage I don't think there is sufficient evidence to take it beyond this point. The Court: The motion is overruled."

nance under which he was convicted both in municipal and superior courts is void for vagueness and contravenes the freedom of speech amendment are still with us. These issues are precisely why the case is here and should be answered. Present trends of widespread public disturbance throughout this state and this country in recent years invite a definitive ruling on this ordinance.

Spokane City Ordinance No. C1377, § 3, under which the complaint was filed, reads:

> Every person who shall on any street, sidewalk, alley, or public place, or in or upon any private house, building or premises, act in a noisy, riotous or disorderly manner, or use any profane, obscene or abusive language, or do any indecent or immoral act tending to debauch the public morals, or do any act tending to disturb the public peace, shall be guilty of a misdemeanor.

So far as pertinent to the events of this case, the complaint charged that defendant acted in a noisy, riotous and disorderly manner, used abusive language and committed acts tending to disturb the public peace. Defendant contends the language of the ordinance is so vague that a charge cannot be brought under it which will meet the constitutional requirements of reasonable certainty. A person of ordinary understanding, he says, would not understand what conduct is prohibited.

Defendant raises this issue of vagueness only as to the ordinance, and not as to the charge set forth in the complaint. It is the ordinance and not the accusation which he challenges for he makes no attack upon the complaint to challenge it for vagueness and uncertainty, too.

Was the ordinance specific enough to enable a person of ordinary understanding and intelligence to understand the kinds of conduct it was designed to prohibit? Would a person of ordinary understanding comprehend what is meant by acting in a "noisy, riotous or disorderly manner" or in a way "tending to disturb the public peace?"

It is virtually impossible in law to make a straightforward, simple, declarative statement that cannot in one way or another be questioned, doubted or denied. That doubts

are expressed or expressible, however, does not render the proposition doubtful. The constitutions require no more of the wording of a criminal statute or ordinance than that it be susceptible of comprehension by a person of ordinary or common understanding. In my judgment, anyone who could not understand this Spokane ordinance would be incapable of comprehending a municipal traffic code or even the traffic signs and symbols which control traffic on our streets and highways, and would have great difficulty in comprehending a weather report.

A person of ordinary understanding, I think, can readily perceive the difference between conduct that will be deemed noisy, riotous, abusive and disorderly in one context and conduct that is acceptable in others.

It requires no more than average intelligence and comprehension, regardless of education to understand, for example, that behavior considered suitable at a baseball or football game or a prizefight, could well amount to disorderly or disruptive conduct at a religious service, or in a theater, or in a college classroom, library or laboratory, or at a scholarly symposium or academic convocation. Conduct acceptable in law in some situations should be readily identifiable by persons of common understanding as a disruptive breach of the peace or disorderly conduct in other circumstances and there is rarely a true mystery about distinguishing one occasion from the other.

Black's Law Dictionary 556 (4th ed. 1951), for example, defines *disorderly* as follows:

> Contrary to the rules of good order and behavior; violative of the public peace or good order; turbulent, riotous, or indecent.

Accordingly, what may be lawful and acceptable conduct in one context may be deemed noisy, riotous, disruptive and disorderly in another, and a person of ordinary intelligence should have little difficulty in perceiving the difference.

In similar context, for example, lewd, obscene, libelous and insulting words uttered under such circumstances that their very utterance will publicly inflict injury or tend to

incite an immediate breach of the peace or induce a riot can well be determined disorderly conduct. *Cantwell v. Connecticut,* 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L. Ed 1031, 62 S. Ct. 766 (1942). However peaceful and sincere and whatever their purpose, protest demonstrations and public gatherings are subject to all laws and regulations reasonably designed to preserve the public peace, health and safety. *Cox v. Louisiana,* 379 U.S. 559, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965). This means that, although there is in law a time and place for peaceful protest and peaceable public assemblies, such gatherings and demonstrations are always subject to the law the same as all other legitimate pursuits and enterprises.

There is no precise formula for the language defining public disorder and breach of the peace generally. For example, the State of Washington—unlike the City of Spokane —has subdivided notions of public disorder, breach of the peace, riot, and disruptions of the repose and peace of others into several categories, making it a crime to willfully disturb a lawful assembly or meeting (RCW 9.27.010), and another offense to willfully disturb, interrupt or disquiet any assemblage of people meeting for religious worship (RCW 9.76.050), or to appear in a public place and behave in a boisterous manner. RCW 9.68.040. It is one offense to be disorderly in the presence of either convened house of the legislature (RCW 9.55.010), and another to commit a nuisance by conduct which annoys or injures the comfort or repose of any considerable number of persons. RCW 9.66.010. A different statute in this vein describes a vagrant as a lewd, disorderly or dissolute person. RCW 9.87.010.

In *State v. Levin,* 67 Wn.2d 988, 410 P.2d 901 (1966), we held that the word "disorderly" means contrary to the rules of good order and behavior, violative of public peace or good order, turbulent, riotous or indecent. This is language of ordinary usage and should be comprehensible to persons of common understanding. A person of common understanding, therefore, should be able to understand the in-

stant Spokane ordinance which makes it an offense, *inter alia*, to act in public in 'a noisy, riotous or disorderly manner, or to use abusive language, or to act so 'as to induce a disturbance of the public peace.

As earlier noted, RCW 9.27.010 makes it unlawful to "wilfully disturb any assembly or meeting not unlawful in its character," and a similar statute (RCW 9.76.050) makes it unlawful to disturb or interrupt religious services—both obviously intended to prevent private encroachments on the rights of peaceful assembly. Construing a similar statute in *State v. Stuth*, 11 Wash. 423, 39 P. 665 (1895), this court held good an information which charged that the defendant, at a meeting of the Salvation Army, a religious society, "did use loud 'and profane language, and did smoke a cigarette, and did refuse to leave said room when requested so to do." The information, we said, charged an offense under the statute because the word "disturb" has a well-known legal significance. The rationale of that case applied to conduct in a large public gathering amounts to a holding, I think, that the Spokane ordinance here is phrased in words of common and general usage and is comprehensible to persons of average intelligence and understanding. *See State v. Finrow*, 66 Wn.2d 818, 405 P.2d 600 (1965). The ordinance, therefore, I think meets the constitutional standards that 'a penal law be so written that a man of ordinary understanding will be able to comprehend it.

This court has recently sustained a similar enactment in *State v. Dixon*, 78 Wn.2d 796, 479 P.2d 931 (1971), where we held that RCW 9.27.060(2) and (3) prohibiting unlawful assemblies and employing such terms as to "disturb the public peace," or "attempt or threaten any act tending toward a breach of the peace," were not unconstitutionally vague or indefinite.

And the ordinance here fits the circumstances of the occasion. Mr. Agnew, at the invitation of the Republican Party, was speaking at the Parkade Plaza to an outdoor crowd of several thousand people gathered there at open invitation. Young McDonough, as an invited guest to see

and listen, had not been included among the speakers nor asked to express his views or otherwise participate in the program. He was not a performer; the throng of people had been invited there to hear Mr. Agnew and not Mr. Mc-Donough. Mr. McDonough's invitation, unlike the one given Mr. Agnew, extended only to listening and not to speaking or performing. As one of thousands comprising the general public invited to hear the Republican candidate for the vice-presidency present his campaign, McDonough's role as guest did not go beyond listening and seeing.

A full-color, sound newsreel film taken at the event shows that the speaker was discussing the dangers of nuclear war[2] when the word "Warmonger" was shouted from the balcony above the crowd in the lower plaza. The film shows that the speaker paused, looked up and asked, "Who said that?" and defendant, from the balcony railing, responded, "I said it," and held up the "V" sign for peace. There were a few other words indistinctly exchanged, but at just about the moment that defendant made the "V" sign, a policeman reached his side and without any hesita-

---

[2]"MR. AGNEW: The vice-presidential candidate for the Third Party had some things to say that made anyone who contemplates with horror the prospect of a nuclear conflagration made us all very worried. [sic] Today the Third Party ticket actually bristles with increased iron-jawed defiance of good judgment. A nuclear catastrophe can be unleashed by a thoughtless gesture on the part of the person in power. A single careless incident can turn this Nation and the world into a cinder. The United States has never been a saber-rattling nation. I want to remind you that, at a time without any question having the only nuclear capacity in the world, we could have conquered the world, and for those who called us imperialists, look at our conduct. MR. McDONOUGH: Warmonger! [faintly] MR. AGNEW: Who said that? MR. McDONOUGH: I said it. [faintly] MR. AGNEW: Whoever did— MR. McDONOUGH: What the hell do you think this means? [makes "V" sign with fingers] MR. AGNEW: You did? [Officer reaches defendant's side and with the assistance of several bystanders pulls him forcibly from the railing.] [booing] MR. AGNEW: Well, it's really tragic to think that somewhere, somebody in that young man's life has failed him. Somewhere. [applause and booing] MR. AGNEW: But where dissent interferes with the rights of others to express an opinion or to have that opinion heard, it is not the kind of dissent that this country is looking for or needs. [Mr. Agnew continues speech.]"

tion pulled defendant away from the balcony railing. The court in its opinion here is saying no more than had a public disturbance actually developed on the balcony, it might well have become dangerous, but so momentary and fleeting was the interruption that the point of danger, real or illusory was not reached.

Thus, although charged with disturbing the peace and acting in a noisy, riotous and disorderly manner, the court concludes as a matter of law that defendant was shown by the evidence to have done little more than shout the solitary word "Warmonger" at an open-air political rally at the speaker and that his subsequent words—innocent enough if taken by themselves—were in response to a query from the speaker to make his identity known. With this assumption of fact I agree, for in the film—apparently taken and played at a normal speed—the time elapsing between the uttering of the word "Warmonger" and the query, "Who said that?" and the reply, "I said it," or words to that effect, was about 6½ seconds according to my timing of the film and the total time between the word "Warmonger" and the arrival of the officer at defendant's side took not over 15 seconds. Then, too, the record, visual, auditory and written, shows, too, that the crowd being addressed was not a quiet one. It demonstrated enthusiastic and vocal support both for and against the speaker's declared points of view.

But had the defendant persisted in this behavior so as to deprive the speaker of his audience, or to interfere with the rights of others to hear, or the speaker to speak—the issue of defendant's guilt must inevitably, I think, have been resolved against him as a matter of law and would have constituted disorderly conduct under the Spokane ordinance. I therefore concur in the result but would sustain the ordinance under which the defendant was charged.

FINLEY and NEILL, JJ., concur with HALE, J.