[No. 42075.   En Banc.   November 16, 1972.]

THE CITY OF PASCO, *Respondent*, v. DOUGLAS EARL DIXSON, *Appellant.*

*Jan E. Peterson, Roy B. Erickson,* and *Michael H. Rosen,* for appellant.

*D. Wayne Campbell* (of *Campbell & Johnston*), for respondent.

HALE, J.—The Pasco police department did not mobilize its entire force simply to put down obscenity in Volunteer Park the summer evening of July 7, 1970. Their mission was to execute four warrants of arrest—two regular and two John Doe. Although they served but one of the warrants, they did make one warrantless arrest for public obscenity. This is the obscenity case.

According to Lieutenant Glen Butner, the department was aware of "narcotics being bought and sold in Volunteer Park" across from the courthouse and intended to "put a stop" to it. Police informants sent into the park had bought narcotics there, and on their information the four warrants were issued, two naming specific defendants and two naming John Doe. Lieutenant Butner said that his officers could identify the two John Does when they saw them, but that, at the time the warrants issued, their true names were unknown to the police. A plan was conceived to execute the four warrants, and Lieutenant Butner said that, to carry it out, "We had approximately 24 male police officers that were there, and then there were—there was a clerk involved in it, too." The entire police department was mobilized, Lieutenant Butner said, "and we set up a plan of how we would arrive at the park, without the certain people that we had the warrants for . . . getting away from us."

He described the plan:

There was a two-man squad that was to enter from the northeast side of the park, and a two-man squad was to enter from the southeast portion of the park, and the other two squads were to be let out of the van up in front of—well this street right straight across from the courthouse, on 4th street.

Although the police expected to find a large number of

young people in Volunteer Park, the record shows that their raid was not in expectation of being called upon to put down a riot or public disorder or to quell concerted acts of violence, for none was evident before the raid and there was no sign of any impending public disorder or public danger. The police mission and the plan designed to carry it out was simply to serve the four arrest warrants and take into custody the defendants against whom they had been issued.

Closest to the events which led to the defendant's arrest was Officer Robert Martin who had been a Pasco policeman for 6 months. He testified that he was assigned to group two and reached the park in a Mayflower moving van, and that they unloaded from the van and entered the park at 9:05 p.m. He was the second man out of the van and, as he moved into the park with his fellow officers, he observed 150 to 200 people there. His testimony described the incident upon which the arrest was made:

The van pulled up along side of the park and we got out. I was the second one out, and there was two small groups almost right by where the van parked, and I contacted them and had them wait, and then I moved on through the park and contacted another group in the park, in which the defendant was sitting, and I told them to remain seated. Q. How many people were in this group? A. Approximately eight to ten. Q. Eight to ten? A. Yes, sir. Q. And what happened after you instructed these eight to ten people to be seated? A. Well, they all remained seated. They all sat down. Q. Including the defendant? A. Yes, everyone sat. Q. And then what happened? A. They were instructed that our purpose was — what was going on, and that we wanted them just to remain seated exactly where they were, with their hands in sight, until our superiors arrived. They all sat down, and all except the defendant obeyed this order to a "T", except one other young lad that played a guitar while he was sitting there. Q. Did the defendant obey the order? A. Not per se. Q. Will you explain that? A. Doug, Mr. Dixson, the defendant, after he was contacted — well, first of all he had a pack of cigarettes which he threw out in front of them, and we asked him to return them to his pocket and

leave them there. This was done with the purpose in mind, the purpose of the raid was a drug raid, and we wanted every person that we contacted to have whatever materials they had on them at the time to remain on them. This was the reason he was asked to pick up the cigarettes and put them back in his pocket. Q. Then what happened? A. This was done, and a few moments later I glanced at one of the other officers, Officer Miller, and glanced back at Doug, and he had removed the cigarettes from his pocket again and gave them another heave out in front of him probably two or three feet. The second time he was asked to pick up the cigarettes and place them back in his pocket, which was done, and they remained in his pocket after the second time he was asked. When we contacted him why he seemed rather reluctant to do what we said. He voiced the statement, he said "Shit, you pigs got no right" after the cigarettes were put back in his pocket the second time. Also he had a young lady with him. He then embraced this girl in rather close contact . . . Q. What do you mean embraced her? A. He hugged her and gave her a kiss, and laid her in a prone position, and Doug, Mr. Dixson, the defendant, obtained a prone position except for his head which he raised on his elbow in this manner (demonstrates). He was told to refrain from this type of activity. They both sat up then and separated.

Officer Martin continued:

A few minutes after this Lt. Butner and the Chief arrived, and they looked the group over. They had a bunch of people that they had warrants for. They looked at the group in general and said that none of these people were ones that they had a warrant for, so they were told to leave the park; that the park would be closed for the rest of the evening, and they would have to leave at this time, which they did, except for the defendant. Q. And what did he do? A. He stated he didn't have to leave; it was a public park, and he was going to sit right there. Lt. Butner stated that the park would be closed for the rest of the evening, and he would have to leave. Q. Then what happened? A. Mr. Dixson stated he would remain, and at this point we stated he wouldn't; that he was under arrest, and he was taken to the paddy wagon. Q. Then what happened? A. My attention from the defendant was taken away at this moment. He got up and

was handcuffed, and I was busy with another lad, so I didn't know exactly what the defendant was doing until they got to the wagon, the police vehicle. At this time I noticed and looked to see where his whereabouts were, to see that there was no further trouble.

and, speaking of the defendant:

At the time I looked back at him he was stepping into the vehicle. As he went in he turned around to the Park in general, no particular individual, and hollered "you fuckin' pigs."

On cross-examination, Officer Martin acknowledged that "The whole force, which consists of probably twenty-five to twenty-eight [police officers] took actual part in it;" that the raid and arrest took place shortly after 9 p.m.; that there were between 150 and 250 people in Volunteer Park the evening of July 7th; and that the police officers were shouting orders such as "hold it" or "sit" and he ordered one group in a louder than normal voice to "sit."

On cross-examination, he could give no authority for ordering peaceable citizens about except the directions he had received from his senior officer, but acknowledged that the defendant did comply with his orders to remain seated. Describing the cigarette incident on cross-examination, Officer Martin said that "the second time the cigarettes were removed from his pocket I did in a rather loud manner tell him to keep them in his pocket."

When asked why the defendant was arrested, the officer said, "My original thought at the time of the arrest was disobeying an officer," to which he added the failure to leave the park and the failure "to remain seated with his hands in sight." Describing his recommendation to Lieutenant Butner that the defendant be arrested, Martin testified:

Q. All right, now, when Lt. Butner came up and looked at the group and he saw that none of the people he was looking for were there, did you offer to allow everyone to leave at that time, everyone in this group that Doug and Ken were in? A. Yes, at that particular time Lt. Butner told the whole group to leave. Q. You never made the statement to Lt. Butner "You are not going to let him

go?", referring to Mr. Dixson here? A. Well, Doug stated he would remain; it was a public park, and at that time I mentioned to Lt. Butner that we should hold this individual. Q. In other words, you didn't make this statement in response to Lt. Butner's that they can all go? You didn't say at that point "you are not going to let this guy go?" You didn't say that? A. No, I stated that I felt we should hold this individual, and I also stated regarding the other individual, the Devine boy, I stated to Lt. Butner that we should hold him.

He said that, according to city ordinance, the park did not close until midnight but when Dixson and the others were ordered to leave it that night, it was about 9:25 or 9:30 p.m.

Police Officer Jerry Miller testified he had been a Pasco policeman for about 13 months and that he was among the officers arriving at Volunteer Park in the moving van. When he reached the group in which defendant was seated, Officer Martin and another policeman were already there. He described the incident as follows:

Well, when I first arrived at this group they had just been seated by Officer Martin, and there was also another officer at the group, too. First I observed the defendant there because of his general harassment of the officers, asking questions, and telling us we didn't have any rights, and . . . I recall one statement where he stated "I thought this was America; not Nazi Germany." His first action was when he pulled the cigarettes out and threw them down on the ground a few feet away from him, and Officer Martin asked him to put them back, and he grabbed them and made a statement that they may be crushed if he put them in his pocket, but he did put them in his pocket, and a few minutes later he picked them out and threw them out again, and Officer Martin again asked him to put them back, and then shortly after this he embraced this girl which was in the crowd, pretty much in the center of this group, and laid her out prone on her back and was kissing her, and Officer Martin again advised him that he was to keep his hands in sight and be seated. At this time he hollered "Shit, you pigs got no right", and he kept talking to him, all the officers

in general, and asking questions, and — I can't recall the exact questions he was asking.

and

I escorted him toward the paddy wagon, and he immediately began hollering "fuck you pigs; you got no rights."

and that the defendant repeated this language about six times.

On cross-examination, Officer Miller admitted that, as the officers first went through the park they were yelling and hollering "stop" and "hold it" and that there "was quite a commotion" in the park produced by the officers' actions. He said the defendant had done nothing to justify the arrest other than embrace the young woman beside him and utter the remarks mentioned. Officer Miller corroborated Officer Martin's statement that, after the officers reached the defendant's group and ordered them to remain seated, the defendant threw his cigarettes down in front of him and that Officer Martin twice ordered the defendant to return the cigarettes to his pocket. When asked why they had arrested Dixson, the witness said, "The only reason I tried to arrest him was because of his vulgar language."

Both Officers Martin and Miller said that the defendant was arrested, handcuffed with his hands behind his back and forcibly led across the park and put into the paddy wagon.

Defendant Earl Dixson gave a different version of the events. He testified that he was 20 years of age and regularly employed full time in Pasco. He was with his girl friend in the park when, at about 9:15 that evening of July 7th:

Well, we were sitting and talking, and he [a friend] was playing my guitar, and I heard this commotion from behind me, and I turned around and saw these policemen jumping out of the van, and they were yelling and screaming and telling everybody to sit down and not to run, and the policeman came over to us and told us all to sit down, so I asked him what was going on, and he just told me to sit down and shut up, so I sat down, and they

herded us all together, and I asked him again what was going on.

Dixson said as he was starting to sit down he reached into his back pocket to get his cigarettes so that he would not crush them and one of the officers told him to put them back; that he asked the officer if he could smoke one and the reply was "no;" he said he put his arm around his girl friend at his side to reassure her and was about to kiss her on the cheek when told to desist and then he said he "asked them what was this, Nazi Germany, or America" and to that "They just told me to shut up."

As to the arrival of Lieutenant Butner, the commanding officer, and the arrest, Dixson testified:

Q. Now, did Lt. Butner come to the group where you were seated? A. Yea. Q. And what did he say to the group? A. He looked at everybody and said "Who's got the marijuana?" "Who's got the beer?" Things like that. Q. Did Officer Miller at that time say anything to Lt. Butner? A. No. It was Sgt. Butner at that time. He looked everybody over and told everybody to leave, so I got up, and then I decided why do we have to leave. I thought it was a free country, so I sat down, and I said "You've got to give me more cause than that, than just your word?," and he said "I'll warn you one more time, or I'll arrest you", and I said "no, sir", and I started to get up to leave, and I started leaving, and Officer Miller looked at Butner and said "you are not going to let him get away, are you?", and the Sgt. said "no, get him", so he grabbed me, and I started walking toward the paddy wagon, and Officer Miller and another officer came up and each grabbed my arm and led me toward the paddy wagon.

The officers, he said, grabbed his arms, put them behind his back and handcuffed his hands together. He may have sworn at them a little bit, he said, because it "hurt pretty bad" but that he was not yelling profanities out loud when they took him across the park to the paddy wagon.

Defendant's girl friend, who had accompanied him to the park that evening, corroborated his version of the incident. She testified that they were put into a group of 8 to 10

people, and when she asked them what they were doing Officer Miller said, "Shut up and sit down." Defendant, on seeing an officer running after someone, asked an officer what was going on and was ordered to "shut up and sit down." She said that, speaking in what she described as a normal tone of voice, she asked the defendant, "Why are the pigs here?" Nearly everyone in her age group, she said, refers to police officers as pigs, and that she was speaking to Dixson and not the officers and she did not intend to be either insulting or argumentative toward the police. Both officers testified that they were not offended or upset by the use of the term "pig."

Defendant was charged and convicted in the police court of the City of Pasco under Pasco City Code § 10-5.156 (now Pasco Municipal Code 9.04.020) of "conducting himself in a disorderly manner by creating a disturbance . . . in the presence of another by using abusive, lewd, vulgar or obscene language in the presence of another or by using loud, profane, vulgar or obscene or lewd language toward anyone. Towit: Volunteer Park."[1]

He appealed to the superior court where a jury found him guilty, and he was thereupon sentenced to 6 months in jail and to pay a fine of $500 and taxable costs. He appeals the judgment and sentence making four assignments of error. Mainly he contends that the city failed to prove a prima facie case; that the Pasco ordinance is unconstitutionally vague and overbroad; and that the ordinance infringes upon the freedom of speech concepts of the constitutions.

■ Public obscenity is not protected by the freedom of speech provision of the First Amendment nor by any other constitutional provision. *Chaplinsky v. New Hampshire,* 315

---

[1]Pasco City Code 9.04.020 (formerly § 10-5.156) provides:

"It is unlawful for any person to conduct himself or herself in a disorderly manner by creating a disturbance within the city in the presence of another by fighting or arguing or using abusive, lewd, vulgar, or obscene language in the presence of another, or by using loud, profane, vulgar, obscene or lewd language toward anyone or by urinating in public view or by having his or her clothing in such disarray that he or she would appear indecent to the general public."

U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942). A community may constitutionally enact laws making it a public offense to use lewd, obscene and insulting or "fighting" words in public. "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Cantwell v. Connecticut,* 310 U.S. 296, 309, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940).

The constitutions do not compel the people of a community in using their public parks and playgrounds to put up with persistent displays of indecent, obscene or immoral conduct, or to listen to obscene, vile and filthy language, or to expose their children to such behavior as the price of enjoying the use of the park. Even the most perverse distortion of the constitutions cannot be said to deprive a community of the power to keep its parks reasonably clean of these forms of pollution. Freedom of speech, therefore, under the basic charters does not render society helpless to establish remedies against obscenity, indecent behavior and public displays of lewdness, nor does it prohibit the enactment of reasonable codes to preserve the public parks for the beneficial use and enjoyment of everyone. *Roth v. United States,* 354 U.S. 476, 1 L. Ed. 2d 1498, 77 S. Ct. 1304 (1957); *Chaplinsky v. New Hampshire, supra; Cantwell v. Connecticut, supra.* The state and its subdivisions may thus constitutionally enact laws to prohibit public obscenities and lewdness and public displays of immoral or lewd or indecent conduct, and the City of Pasco was, therefore, within its corporate police powers in enacting laws to keep its park free of lewd, obscene and other forms of indecent behavior.

As to the other points raised and aside from an obvious nonsequitur with reference to Volunteer Park in the last sentence of the complaint, we are of the opinion that the complaint does charge an offense, that the ordinance upon which it was issued does not inhibit freedom of speech, and that both the complaint and the ordinance are neither un-

constitutionally vague nor incapable of being understood by a person of ordinary understanding. *State v. Dixon,* 78 Wn.2d 796, 479 P.2d 931 (1971); *United States v. Vuitch,* 402 U.S. 62, 28 L. Ed. 2d 601, 91 S. Ct. 1294 (1971).

This brings us to what we perceive to be the weightiest claim of error. Putting the defendant's conduct in the worst possible light and viewing the evidence most favorably to the prosecution, the question persists, Did the defendant's conduct as shown by the record constitute a violation of the ordinance? On this question, to support a conviction, the proof must show that the defendant was *disorderly in public* by using obscene language in the presence of another, that is, uttering obscenities so as to amount to a public disorder in and of itself, or to cause, produce, or tend to cause or produce a public disorder.

Holmes' famous aphorism, that the most stringent protection of free speech would not protect a man in falsely shouting "fire" in a crowded theater, is preceded by an equally trenchant truism that the character of every act depends upon the circumstances in which it is done. *Schenck v. United States,* 249 U.S. 47, 51, 63 L. Ed. 470, 39 S. Ct. 247 (1919). Both ideas are entitled to equal respect in Dixson's case. To show a public disorder, actual or threatened, existing or impending, the uttered words must, therefore, be related to the circumstances in which they were uttered. Thus, the prosecution carried the burden of proving disorderly conduct as charged in the complaint arising from the language spoken by the defendant, *i.e.,* the uttering of obscenities in public so as to cause, produce, or tend to cause or produce, a public disorder or in such a way that their very uttering of them in and of itself amounted to a public disorder.

█ Was there prima facie proof that, under the circumstances shown by this record, the defendant violated the ordinance as charged by using obscene language in a public place so as to create a public disturbance? An analysis of the evidence will show—and the arresting officer acknowledged it to be so—that the arrest was made and prosecu-

tion maintained because of the defendant's solitary utterance, "Shit, you pigs got no right." This incomplete thought unrepeated might well be deemed vulgar speech or, in other circumstances, obscene if done repeatedly and with design to offend or in disregard of whether it offended others peaceably in the park. But the record makes clear that the statement was not made under circumstances of public disorder, violence or danger then existing or threatened and thus under circumstances from which the jury could properly infer disorderly conduct. The record is devoid of proof that this remark was made with design or intent to create a public disturbance or to offend other occupants of the park—except perhaps the police officers who testified they were not offended—or to disturb others in the quiet enjoyment of the park or that the remark would tend to produce any of such consequences, for no evidence was presented from which a public disorder, disturbance or even commotion could be inferred except that created by the officers in sweeping noisily through the park and barking orders to the peaceable citizenry then occupying it. Nor does the record show the offensive language to have been used in such a loud, repetitious or persistent manner as to amount to a disorder in and of itself.

From the outset, the record shows the defendant quietly standing or sitting in a group of other peaceable and quietly behaved individuals in a public park during lawful hours on a summer evening, 3 hours before park closing time. It shows the Pasco police department in full strength moving swiftly through the park, barking orders and telling everyone to stay in place. It shows sudden and drastic police action and the threatened resort to force upon apparent peaceful and law-abiding citizens where there was no imminent public danger, nor threat of violence, nor probable cause to believe that the defendant or others near him were in the process of committing, were about to commit, or were withdrawing from the scene of a crime. The sole and avowed purpose of the so-called police raid was to serve four warrants, two upon named defendants and two

John Doe warrants, upon individuals whose identities but not names were known to these police officers. The police knew the four individuals for whom they were looking and soon learned that the defendant was not one of them.

Without legal justification so far as this record shows, some of the officers ordered the defendant and those near him to sit down when they had an apparent legal right to stand; told him to "shut up" when he had a right to speak; told him to put his cigarettes in his pocket when he had a right—without littering—to place them on the ground before him; told him he could not smoke when the law allowed him to smoke; ordered him and others to leave the park when he had a right to remain. His solitary 6-word utterance, made under these circumstances, did not, we think, as a matter of law, constitute a public disorder nor otherwise rise to the magnitude of a criminal violation of the Pasco disorderly conduct ordinance prohibiting public obscenity toward others. There was nothing about the situation in the park that summer evening endangering the public safety or threatening injury to life or property as shown by this record to warrant the police in ordering people about or running them out of the park before closing time. The public peace and safety was not and had not been threatened; there was no threat of riot impending; there was no dangerous or unlawful assemblage. *Spokane v. McDonough*, 79 Wn.2d 351, 485 P.2d 449 (1971).

The law and the people who employ police officers demand much of them—perhaps too much. It expects of police officers not only courage in the face of danger, but helpfulness in the presence of infirmity, courtesy in the face of rudeness, and patience and calmness where the circumstances may engender neither in an ordinary citizen. To these sublime virtues, the law insists that police officers in furthering the public interest, safety and convenience, accept the discipline of the job, assume the continuing burdens of training and in-service education, develop a professional competence and, above and beyond all this, exercise sound

judgment when the public itself in like circumstances would in all probability be incapable of exercising it.

Assuming arguendo that the defendant's words standing alone were as a matter of law to be treated as an obscenity, its solitary utterance unrepeated and unaccompanied by any other conduct or behavior evincing a design or purpose to create a public disturbance, and with no public disorder or danger impending or threatened, did not, we think, descend to the quality of criminality described in the ordinance as "obscene language used in the presence of another" so as to constitute disorderly conduct punishable by imprisonment.

In the same context, the words reputedly uttered by the defendant after his hands had been painfully and forcibly handcuffed behind his back and as he was being led to the police car under arrest, although probably obscene in a general sense, obviously amounted to no more than an afterthought in the prosecution's case. These words, directed as they were not to the public but to the officers leading him away to jail, were uttered under such circumstances that the defendant was without any present ability to create or even foster a public disorder. Uttered under circumstances of extreme provocation, unaccompanied by any attempt to or incitement of others to resist the police, whose actions toward the defendant were at the time, to say the least, of doubtful legality, the spoken words in and of themselves did not constitute an offense under the Pasco city ordinance.

We are of the opinion that the record fails to show even prima facie that defendant committed the crime whereof he was charged and convicted.

The judgment is reversed and the case dismissed.

FINLEY, ROSELLINI, and NEILL, JJ., and RYAN, J. Pro Tem., concur.

HUNTER, J. (dissenting)—The majority has reversed a judgment entered upon a jury verdict, charging the defendant with "conducting himself in a disorderly manner by

creating a disturbance . . . in the presence of another by using abusive, lewd, vulgar or obscene language in the presence of another or by using loud, profane, vulgar or obscene or lewd language toward anyone. Towit: Volunteer Park."

If, in fact, the defendant's conduct was within the ambit of this charge, he was clearly in violation of the Pasco disorderly conduct ordinance which is as follows:

It is unlawful for any person to conduct himself or herself in a disorderly manner by creating a disturbance within the city in the presence of another by fighting or arguing or using abusive, lewd, vulgar, or obscene language in the presence of another, or by using loud, profane, vulgar, obscene or lewd language toward anyone or by urinating in public view or by having his or her clothing in such disarray that he or she would appear indecent to the general public.

Pasco City Code 9.04.020 (formerly § 10-5.156).

The majority has held the ordinance to be constitutional, with which I agree, but it has gone at great length to detail the conflicting facts and comes up with a resulting opinion in disagreement with the superior court jury on this factual situation.

It is not within the province of this court to disturb a jury verdict upon conflicting evidence where there is substantial evidence to support its findings.

Here the police not only suspicioned that narcotics were being bought and sold within the group of individuals that were frequenting the park, but they had warrants for the arrest of four individuals who they believed to be in the park on the occasion in question. This was a well planned and conceived raid by the Pasco police to stop dope traffic in their city public park. I can see nothing unreasonable under these circumstances when the police converged on these users of the park to require them to sit down and keep their hands in sight until the raid was completed, after advising them the purpose of the raid. Most of the occupants complied—but not the defendant, Douglas Dixson. Substantial evidence in the record shows that he threw

his cigarettes on the ground to taunt the police and, in the earshot of a substantial number of others present, used the language, "Shit, you pigs got no right;" that he embraced a young girl sitting next to him, kissing her and placing her on the ground in a prone position; that he refused to leave the park when later requested, all of which incited others to disobey the officers, creating a disturbance in public. He was arrested, and on the way to the paddy wagon substantial evidence shows that he yelled about six times, "fuck you pigs; you got no rights," during which time other people were running and yelling and being arrested.

The jury had no difficulty in determining the defendant used vulgar and obscene language in public and creating a disturbance by arguing and using abusive language. Neither do I. The language used in arguing with the officers was lewd and vulgar and clearly within the ambit of the Pasco disorderly conduct ordinance. Officers should not be hamstrung in their effort to protect the public from being subjected to such vile language used by the defendant, and in restraining the creation of a disturbance in public.

I would affirm.

HAMILTON, C.J., and STAFFORD, J., concur with HUNTER, J.