**STATE of Iowa, Appellee,**

v.

**Charles HARDIN, Appellant.**

No. 91–1777.

Supreme Court of Iowa.

April 21, 1993.

Sally Frank of Drake University Legal Clinic, Des Moines, for appellant.

Bonnie J. Campbell, Atty. Gen., Thomas G. Fisher, Jr., Asst. Atty. Gen., John Sarcone, County Atty., and Jeff Noble, Asst. County Atty., for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN, and SNELL, JJ.

NEUMAN, Justice.

Defendant Charles Hardin and two friends intentionally disrupted a speech by President George Bush during a Republican fund-raising rally in Des Moines. Hardin now claims his subsequent conviction for disorderly conduct cannot stand because the statute's enforcement abridges his constitutional rights to speak freely and petition the government. We disagree, concluding under this record that Hardin's heckling prevented others attending the rally—including the speaker—from enjoying their own first amendment freedoms. Therefore we affirm.

The rally took place in October 1990 at the Civic Center. Anyone could attend by paying the $25 admission fee. The event was designed to raise funds and support the reelection of Representative Tom Tauke and Governor Terry Branstad. It was also designed to generate support for President Bush, the featured speaker, in connection with the government's attempt to oust Saddaam Hussein from Kuwait.

Because of the controversy surrounding the President's military policies in the Persian Gulf, organizers developed a plan to deal with potential protesters. Although a band and cheerleaders were on hand to generate enthusiasm for candidates Tauke and Branstad, the President's address was anticipated to be of a more serious tone. Thus a protocol was developed whereby anyone disrupting the speech would be asked to sit down and be quiet, asked to leave if they did not do so, and arrested by city police officers only as a last resort.

Hardin's testimony at trial revealed that he and his friends viewed the event as an opportunity to personally convey to the President their opposition to the government's Persian Gulf policy. Once the President began speaking, they planned to stand up and shout their concerns in turn. They then intended, in Hardin's words,

to keep chanting until we were no longer able to make our point, and I didn't know what was going to stop that. I mean, whether it was the crowd taking up a chant in response to us or kicked out or arrested. I really had no feel for what was going to happen.

At the appointed time during the President's speech, one of Hardin's friends stood up and shouted, "Bring the troops home from Saudi Arabia." Then Hardin stood and said, "Mr. President stop the build up." Another friend shouted, "No blood for oil." The trio then continued that chant. After three to five minutes, one of the event coordinators approached Hardin and asked him to sit down. Hardin said he looked at him and then "returned to what I was doing." The organizer repeated his request to no avail. The police were summoned and the three were escorted from the auditorium without further incident.

Hardin was charged with disorderly conduct, in violation of Iowa Code section 723.-4(4) (1989). A person commits this simple misdemeanor when "[w]ithout lawful au-

thority, or color of authority the person disturbs any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly." Iowa Code § 723.-4(4). Hardin demanded a jury trial.

By the time the case was tried in February 1991, the Persian Gulf War (also known as Operation Desert Storm) was in full swing. One of the potential jurors appeared in court wearing a "Desert Storm" T-shirt. Another showed support for American troops by attaching a red, white and blue ribbon to her purse. Others reported having seen combat duty or being related to persons currently serving in the military.

Although the record is unclear on the point, Hardin apparently sought to challenge certain jurors for cause outside the presence of the others. The court denied the motion. The court also denied Hardin's challenge for cause directed to the juror in the "Desert Storm" T-shirt and another who was a veteran.

The jury ultimately convicted Hardin as charged. When Hardin's posttrial motions were denied, he appealed to the district court which affirmed in a written ruling. *See* Iowa R.Crim.P. 54 (governing appeals of simple misdemeanors). He then successfully petitioned this court for discretionary review to contest the district court's ruling on the question of whether, as a matter of law, he was "without authority" to disturb the meeting at which President Bush was speaking. Without proof of this essential element of the crime, Hardin argues, he cannot be convicted of disorderly conduct. He also challenges the court's ruling on the jury issues.

■ I. Because Hardin contests his criminal conviction on constitutional grounds, our review of the trial court's findings is de novo. *State v. Gregg*, 464 N.W.2d 431, 432 (Iowa 1990). We are obliged to interpret the statutory phrase "without legal authority" in light of the free speech protections Hardin asserts. *State v. Williams*, 238 N.W.2d 302, 308 (Iowa 1976).

II. Hardin frames his principal contention this way: He had the right to act as he did under the petition and free speech clauses of the Constitutions of the State of Iowa and the United States. His claimed authority rests on the nature of the meeting—a political rally—and his view that, under those circumstances, the State cannot abridge his right to interrupt the President and express opposition to government policies. In response, the State concedes that the statute must be construed narrowly to avoid conflict with Hardin's constitutionally-protected right of free speech; but it contends that Hardin's first amendment freedoms do not extend to the conduct demonstrated here.

Although neither this court nor the United States Supreme Court has spoken directly on the issue before us, fundamental principles guide our analysis. Favoring Hardin's case is the recently reaffirmed notion that content-based regulation of speech is presumptively invalid. *R.A.V. v. City of St. Paul*, — U.S. —, —, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305, 317 (1992). Thus, for example, a state may prohibit libel, but it may not prohibit only libel that is critical of the government. *Id.* at —, 112 S.Ct. at 2543, 120 L.Ed.2d at 318. As the Court in *R.A.V.* held in the context of "hate crimes" legislation, the state can prohibit all "fighting words" or it can prohibit all fighting words directed at certain persons or groups, but it cannot criminalize the use of certain fighting words that contain particular bias-motivated messages. *Id.* at —, 112 S.Ct. at 2548, 120 L.Ed.2d at 323.

Hardin claims that just such content-based regulation was at work here. The record reveals that participants at the rally cheered and waived signs—without restraint—in support of Tauke and Branstad. They stood and applauded wildly as they welcomed the President to the podium. None were arrested for their expressive speech and conduct. Only those expressing a discordant view—like Hardin—were stopped.

Hardin's position is weakened, however, when considered in the context of the other interests at stake in an assembly of this sort. The Supreme Court has long rejected the notion that persons wanting to protest

and propagandize "have a constitutional right to do so whenever and however and wherever they please." *Adderley v. Florida*, 385 U.S. 39, 48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149, 156 (1966). Thus in *McIntosh v. Arkansas Republican Party—Frank White Election Committee*, 766 F.2d 337, 341 (8th Cir.1985), a federal court of appeals affirmed the dismissal of a § 1983 action brought by a political activist who was arrested for refusing to leave a $150–a–plate fund-raising luncheon after expressing his intent to disturb the gathering with an unsolicited speech. Rejecting McIntosh's claim that the purchase of a ticket gave him the right to speak on a topic of his own choosing, the court found McIntosh suffered no constitutional deprivation for he had no "right to enter and disrupt this private event by unilaterally altering the sponsor's program and placing himself and his message upon the agenda." *Id.*

Among the state courts that have attempted to reconcile the competing rights of speaker, audience, and protester, the leading case appears to be *In re Kay*, 1 Cal.3d 930, 83 Cal.Rptr. 686, 464 P.2d 142 (1970). The case involved boycotting farm workers charged with disturbing a lawful meeting after they engaged in rhythmical clapping and shouting for five to ten minutes during a California congressman's speech in a city park. There was no evidence that the demonstration affected the program, and charges were not filed until two weeks after the event. *Id.* at 689, 464 P.2d at 145.

In its analysis of the competing constitutional interests at stake, the California Supreme Court observed:

> Under most circumstances, of course, ordinary good taste and decorum would dictate that a person addressing a meeting not be interrupted or otherwise disturbed. The Constitution does not require that any person, however lofty his motives, be permitted to obstruct the convention or continuation of a meeting without regard to the implicit customs and usage or explicit rules governing its conduct. The constitutional guarantees of the free exercise of religious opinion, and of the rights of the people peaceably to assemble and petition for a redress of grievances, would be worth little if outsiders could disrupt and prevent such a meeting in disregard of the customs and rules applicable to it. This inhibition does not mean, however, that the state can grant to the police a "roving commission" to enforce Robert's Rules of Order, since other First Amendment interests are likewise at stake.

> Audience activities, such as heckling, interrupting, harsh questioning, and booing, even though they may be impolite and discourteous, can nonetheless advance the goals of the First Amendment.... An unfavorable reception, such as that given Congressman Tunney in the instant case, represents one important method by which an officeholder's constituents can register disapproval of his conduct and seek redress of grievances. The First Amendment contemplates a *debate* of important public issues; its protection can hardly be narrowed to the meeting at which the audience must passively listen to a single point of view. The First Amendment does not merely insure a marketplace of ideas in which there is but one seller.

*Id.* at 691, 464 P.2d at 147 (citations omitted). Consistent with these principles, the court determined that the statute in question authorized the imposition of criminal sanctions only if "the defendant's activity itself—and *not* the content of the activity's expression—substantially impairs the effective conduct of a meeting." *Id.* at 694, 464 P.2d at 150. The court then identified a three-part test by which this standard should be measured: (1) the nature of the meeting involved; (2) whether the activity substantially impaired the conduct of the meeting; and (3) whether the defendants knew, or should have known, that their conduct violated an applicable custom, usage, or rule of the meeting. *Id.* at 964–66, 464 P.2d at 151–52. The court also decided that in cases in which the appropriate standard of conduct is in doubt, officials should warn or request defendants to curtail their conduct before proceeding with arrest or citation. *Id.* at 696, 464 P.2d at 152. Applying this standard to the facts before it,

the court in *Kay* reversed the demonstrator's convictions, noting that the protest occurred in a large public park in a manner appropriate to the occasion; no indication was given to the protesters that they were out of order; and no substantial interference with the program occurred. *Id.* at 697, 464 P.2d at 153.

Courts in other jurisdictions have applied *Kay*'s balancing test with varying results. In *City of Spokane v. McDonough*, 79 Wash.2d 351, 485 P.2d 449, 450 (1971), the Washington Supreme Court held that a disorderly conduct ordinance could not be enforced to punish an attendee at an outdoor rally who shouted "warmonger" and flashed the "peace sign" at Vice President Spiro Agnew. The court ruled that the conviction could not be upheld without further indication of the protester's intent to break up the meeting or otherwise deprive the speaker and the audience of their rights to hear and speak. *Id.*

Given the more structured setting of a national sorority convention, a Texas court ruled constitutional a conviction for obstructing a lawful meeting when a protestor disrupted a speech by Jesse Jackson, approaching the podium and loudly calling him a liar. *Morehead v. Texas*, 807 S.W.2d 577, 579 (Tex.Crim.App.1991). *See also Carlson v. City of Tallahassee*, 240 So.2d 866 (Fla.App.1970), *cert. denied*, 244 So.2d 431 (Fla.), *cert. denied*, 403 U.S. 910, 91 S.Ct. 2205, 29 L.Ed.2d 688 (1971) (Court upheld disturbing the peace conviction lodged against protester who refused to abide by rule that no signs were permitted inside municipal stadium reserved by political party to promote its own candidates, stating "one's first amendment rights end where the same rights of another begin."). *See generally*, Eve H. Lewin Wagner, Note, *Heckling: A Protected Right or Disorderly Conduct?*, 60 S.Cal.L.Rev. 215 (1986).

■ We believe the balancing of interests evident in these cases offers a sound approach to the controversy before us. Applying the three-part *Kay* test, we are persuaded the court correctly refused to direct a verdict in Hardin's favor.

First, the nature of the meeting here differs markedly from the open-air setting of *Kay* and *City of Spokane*. Hardin's disruptive conduct occurred in an auditorium filled with persons who had paid for the opportunity to sit and listen to an address by the President of the United States. Although earlier parts of the program involved standing and cheering, the portion interrupted by Hardin was otherwise quiet and respectful. Second, the record reveals that the disruption effectively stopped the meeting, if only for a few minutes, while audience members turned to address the commotion, cameras moved in to focus on the hecklers, and at least one citizen shouted at Hardin while another attempted to physically seat him. There is no dispute in this record that Hardin intended to continue the disruption until forced to cease. Finally, Hardin was escorted from the auditorium and arrested only after being asked twice by an event organizer to sit down and remain quiet.

We believe that under these circumstances the State proved that Hardin intentionally disrupted this assembly and that his doing so exceeded any authority he might lawfully claim under the free speech provisions of our state and federal Constitutions. His attack on the constitutionality of section 723.4(4), as applied to him, offers no ground for reversal.

■ III. Hardin also seeks reversal of his conviction based on the trial court's refusal to let him register his challenges for cause outside the presence of the jurors, and its refusal to dismiss one challenged juror for cause. Both decisions are vulnerable only upon proof that the court abused the broad discretion granted in such matters. *State v. Jones*, 464 N.W.2d 241, 243 (Iowa 1990); *State v. Webb*, 309 N.W.2d 404, 414 (Iowa 1981).

■ On the sequestration issue, Hardin contends that the jurors likely turned against him when he was forced to publicly challenge their expressions of a particular viewpoint (*e.g.*, a "Desert Storm" T-shirt) while at the same time insisting that he could not be criminally sanctioned for expressing his own opinion during the Presi-

dent's speech. Assuming without deciding that Hardin preserved error on this point, we find no abuse in the court's decision not to honor his request. Unless the likelihood of prejudice can be shown, a defendant is not entitled to procedures that depart from the usual course. Apart from a bare allegation, Hardin offered no evidence to support his speculation about the juror's attitudes. No proof of prejudice has been shown to warrant reversal. *Cf. Webb*, 404 N.W.2d at 414 (court's refusal to allow individual voir dire of jurors subject to reversal only upon showing that prejudice resulted from collective examination).

Hardin also claims that the court erred by refusing to dismiss for cause the juror with the "Desert Storm" T-shirt. To justify reversal, Hardin must show that the juror held a fixed opinion of the merits of the case such that he could not judge impartially the guilt or innocence of the defendant. *State v. Simmons*, 454 N.W.2d 866, 868 (Iowa 1990). He cannot meet that standard here.

In response to Hardin's challenge, the court questioned the juror about whether he could fairly consider the evidence in the case despite his obvious support for the troops in the Persian Gulf. The juror assured the court that he could. No waiver from that position was elicited by Hardin's counsel.

Although Hardin claims that the mere wearing of a pro-military T-shirt demonstrates the inability of the wearer to judge dispassionately the evidence against a war protester, we are not so convinced. As Hardin concedes, the real question in this case was not the wisdom of the government's policy, but whether a citizen's right to express support or opposition to the policy could ever be limited consistent with constitutional principles. No proof of the juror's predisposition on that crucial issue was shown.

**AFFIRMED.**