[No. 830-3.   Division Three.   August 7, 1974.]

THE CITY OF KENNEWICK, *Respondent*, v. LEON B. KELLER, *Appellant*.

*William F. Nelson* (of *Miracle & Pruzan*), for appellant (appointed counsel for appeal).

*H. W. Felsted* (of *Staples & Felsted*), for respondent.

GREEN, C.J.—Defendant, Leon B. Keller, was charged in the Municipal Court of Kennewick with disorderly conduct in that he

"did wrongfully and unlawfully conduct himself in a disorderly manner, to-wit: by using abusive, lewd, vulgar or obscene language in the presence of another"

in violation of the Kennewick Municipal Code 10.09.010.[1] He was also charged with resisting and hindering the police and malicious destruction of property in violation of sections 10.03.010 and 10.21.070, respectively. After being found guilty of all charges in Municipal Court, the defendant appealed to Superior Court where the charges were retried de novo to the court. The charge of malicious destruction of property was dismissed; he was found guilty of disorderly conduct and resisting arrest. From these convictions, defendant appeals.

Defendant contends: (1) Certain findings of fact are unsupported by the evidence and neither the facts properly found nor the evidence are sufficient to sustain the defendant's convictions of disorderly conduct and resisting arrest; and (2) The ordinance under which the defendant was found guilty of disorderly conduct is unconstitutional.

The record must be viewed by this court in a light most favorable to the State. The flavor of the events leading to the defendant's arrest can best be described by the actual testimony. Officer William Clark, who had been with the

---

[1]The disorderly conduct ordinance, Kennewick's city code, 10.09.010, provides:

"It is unlawful for any person to conduct himself or herself in a disorderly manner within the city by using abusive, lewd, vulgar or obscene language in the presence of another or by using any loud, profane, vulgar, obscene or lewd language toward anyone or by urinating in public view or by having his or her clothing in such disarray that he or she would appear indecent to the general public."

Kennewick Police Department for a little over 2 years, testified:

Q Were you working the evening of December 11, 1971?
A I was.

. . .

Q What are the hours of that shift, Officer Clark?
A We go on duty at 8 o'clock p.m., and the shift ends at 4 a.m.

Q . . . In the course of that day, did you have occasion to observe a motor vehicle driven by the defendant, Mr. Keller?
A I did.

Q When did you first observe this motor vehicle, Officer?
A I was on routine patrol in the Kennewick mall district. . . . I observed a small wedding party proceeded through this area, all the vehicles, and I observed a brown Ford van which I later found that the defendant was driving in the procession.

Q Was there anything unusual about this, Officer?
A I followed the procession, and at the intersections of Kennewick and Cascade, and Kennewick and Dayton, the brown Ford van squealed its tires as it was leaving the stop signs there.

Q . . . What else happened?
A As the vehicle left the intersection of Dayton and Kennewick Avenue, there was a vehicle between my vehicle and his. The street there turns into a 4-lane. There are 2 lanes in 1 direction. I got around the other vehicle and I observed the Ford van accelerating rapidly. I started to clock the Ford van at Ione and Kennewick Avenue. My clock ran from Ione Street to Mayfield. The clock indicated on my speedometer, it registered 55 miles per hour, and that it was a 35-mile-an-hour zone.

Q Then what did you do?
A As I stated, the clock ended at Mayfield. At Newport, I turned on my red lights. I was behind the van at this time, and the van made a right-hand turn onto North Olympia and went about a half block and pulled to the right side of the roadway.

Q What did you do then, Officer?
A I exited my vehicle and contacted the driver of this van.

Q Who was the driver?
A I found him to be the defendant, Leon Keller.

. . .

Q What did you do at that time, Officer?
A I requested to see his operator's license, which he produced. I was examining the license at the scene. We were between his van and my vehicle, and I was contacted by a bystander and was interrupted by bystander that had something to say, that I just didn't have the time to talk to him at the time.
Q What happened then?
A That subject was subsequently arrested for hindering a police officer.
Q Okay. Then what did you do, Officer?
A I returned to Mr. Keller. There was quite a crowd gathering at this time. This location is only a half block from the Arctic Circle. There was [were] quite a few kids coming over from that area to see what was going on, apparently. There were quite a few of the neighborhood people standing outside the residents [sic] watching. I contacted Mr. Keller. Under the circumstances, I didn't feel it was too good an idea to stay in the area due to the traffic hazards the citizens were causing and also the possible explosiveness of the situation with the amount of kids.
Q How many people are there, Officer?
A I would estimate between 50 and 75 people.
Q What did you do then?
A At that time, Mr. Keller was demanding his license back, and I requested that he follow me to the Police Station so I could discuss his driving with him.
Q What did he say?
A He retorted with, "I wouldn't follow you fucking pigs anywhere."
Q Then what did you do?
A At this time, Officer Sydor came over and asked him to follow me again.
Q Who is Officer Sydor?
A My backup unit that evening.
. . . He advised Mr. Keller to follow me to the Police Station. Mr. Keller repeated the same statement again, that he wouldn't follow us. Officer Sydor advised him to watch his language.
Q Now this is kind of a question of fact, Officer: What did Mr. Keller say the next time?

A He reported [retorted] again that he wouldn't follow we "fucking pigs" anywhere.

Q So what did Officer Sydor do then?

A He was advised to watch his language by Officer Sydor, and he retorted with the same words again, and Officer Sydor then placed him under arrest for disorderly conduct.

Officer Clark then described how Officer Sydor took hold of defendant's right arm and started towards the patrol car. Defendant pulled away and Officer Clark then took defendant's other arm. He jerked free with both arms and started swinging, striking Officer Clark on the side of the head. At that point, Officer Clark grabbed him around the neck and Officer Sydor grabbed his legs and started for the patrol car. Thereafter, Officer Clark described the physical difficulty they encountered in getting him into the patrol car. At one point, defendant crawled partially under the patrol car. He was finally placed in the car after another officer arrived on the scene and used Mace.

On cross-examination, Officer Clark said he saw defendant along with two or three others get out of the driver's side of the van and further testified:

A I never did charge him with speeding.

Q He was arrested for his disorderly conduct?

A Right. I just wanted to talk to him about his driving. . . . I didn't have a chance to really talk to him very long. I was examining the license, and I was interrupted by bystander which took my time for a few minutes. . . . I believe he came from another vehicle. . . . He said that he had seen the whole thing and that Mr. Keller had not exceeded 35 miles per hour.

Q Are you sure he didn't say that Mr. Keller wasn't driving the van?

A No. The only thing he stated was the fact about the speed. . . . He was charged with hindering a police officer. . . . I dropped the charges that night when we talked it over in the station.

Q Where was Officer Sydor located?

A He arrived behind me. His vehicle was parked behind mine on the same side of the street, and he was at-

tempting to disperse the crowd or get them out of the street. They were a traffic hazard at the time.

. . .

Q When you placed Mr. Cheney [the bystander] under arrest, where did you put him?
A I took him to the rear of my patrol car, placed him in the rear seat. I tried to identify the subject, and he refused to identify himself adequately, I should say.
Q And then you redirected your attention to Mr. Keller?
A Yes, sir.
Q You walked up to him, I take it, and what did you say to him?
A I believe that is when I asked him to follow to the police station. As I previously stated, I thought the situation warranted it, our leaving the area.
Q And you asked him to follow in the van?
A Yes, sir.
Q What all did he say?
A Well, he demanded his license back, and I advised him it would be returned at the station, but I was going to hang on to it. And then that is when he made his remark. . . .
Q And you didn't get violent or anything like that? That remark didn't get violent or anything like that?
A It embarrassed me.
Q It didn't incite you to some kind of violence or lose control or anything like it, did it?
A Well, of course, it would be just my opinion, if that is what you want.
Q But you didn't do anything violent?
A No. I didn't swing or anything.
Q Have you ever been called that before?
A Yes, sir.
Q Very many times?
A I wouldn't say it is the usual occurrence. It is a situation that is usually explosive at the time.
Q Tempers are high?
A Right.
Q So I take it, it is something that you just have to learn to live with in your job, I take it, is that a fair statement?
A Well, we get into a difference of opinion. *It is against the law as far as I am concerned, and that is where I would —*

Q *So it is grounds to make an arrest in your opinion?*
A *In my opinion, yes.*

(Italics ours.) Although Officer Clark states that he thought defendant was the driver of the van, the court after hearing all the evidence found that defendant was not in fact the driver.

Officer Robert Sydor, who had been 3 years on the Kennewick police force, related his observations on arrival at the scene:

Q What did you observe when you first arrived at the scene?
A . . . I observed several subjects standing around there in the street and the sidewalks.
Q And you observed Mr. Keller at that time?
A When I started asking him to step back onto the sidewalk is when Mr. Keller advised me that Officer Clark has the driver's license, and I said, "Stand by the car."
Q . . . Who did you advise to step back to the sidewalk?
A People that were just standing around there. People who had gathered.
Q Were there people in the street at this time?
A Yes. There was [were].
Q . . . Did the crowd step to the sidewalk?
A Some of them did, and kept mingling back, and some started coming from the Arctic Circle.
Q What was Officer Clark doing at this time?
A He was talking to another subject by his car.
Q . . . Did Officer Clark return and begin talking with the defendant?
A Officer Clark advised me that he had his driver's license, and then he advised Mr. Keller to follow him down to the police station.
Q What did Mr. Keller say?
A Do you want the exact words?
Q Yes.
A "I am not going to follow you fucking pigs anyplace."
Q And then what happened, Officer?
A At this time, I advised Mr. Keller to clean up his language or else we were going to place him under arrest for disorderly conduct.
Q Then, what did he do?

A  Then at this time, he said, "Fuck you pigs." I told him once again, I says, "Clean it up or we will place you under arrest." And then he said, "Well, fuck you." and I placed him under arrest for disorderly conduct.

Officer Sydor then described the scuffle and difficulty encountered by them in getting the defendant into the patrol car. This officer said that initial contact with the defendant took place about 8:15-8:20 p.m. The profanity pronounced by the defendant *after* his arrest for disorderly conduct evoked shouting from the crowd of "police brutality" and the usual things the crowds do when they do not agree. The officer was questioned concerning the loudness of defendant's voice:

Q  Now Officer, these famous phrases of Mr. Keller, with reference to "pigs", how loud did he say this? Was it a normal voice? A quiet voice? Or a loud voice?

. . .

A  You could hear him quite a ways away.

The record does not indicate whether this loudness of voice existed at all times or occurred after the arrest.

Defense testimony denied the use of the alleged profanity prior to the arrest and contradicted in other respects the officers' testimony. This testimony shows that the defendant was not the owner of the van in question, nor was he driving it. While defense witnesses stated that defendant and others attempted to so inform the officers, the officers denied hearing the statement.

The trial court found that while defendant was not the driver of the van he was, nevertheless, guilty of disorderly conduct and resisting arrest under Kennewick ordinances.

First, defendant assigns error to certain findings of fact[2]

---

[2]
IV.
"[S]everal of the crowd were yelling and trying to get Sydor's attention, and that the defendant was demanding the return of his driver's license."
VI.
"[A]nd there was some yelling from the crowd . . . that the crowd was generally hostile and antagonistic to the police; . . ."
VII.
"[T]he defendant started to walk away yelling: . . . that Officer

and asserts that neither the facts properly found nor the evidence in the record are sufficient to sustain the conclusions of law that he is guilty of disorderly conduct and resisting arrest. We agree and reverse.

After upholding the constitutionality of a substantially similar Pasco city ordinance, the court in *Pasco v. Dixson,* 81 Wn.2d 510, 520, 503 P.2d 76 (1972), said:

> This brings us to what we perceive to be the weightiest claim of error. Putting the defendant's conduct in the worst possible light and viewing the evidence most favorably to the prosecution, the question persists, Did the defendant's conduct as shown by the record constitute a violation of the ordinance? On this question, *to support a conviction, the proof must show that the defendant was disorderly in public by using obscene language in the presence of another, that is, uttering obscenities so as to amount to a public disorder in and of itself, or to cause, produce, or tend to cause or produce a public disorder.*

(Italics ours.) It is apparent that our Supreme Court has construed disorderly conduct ordinances, such as the Kennewick ordinance, to be constitutionally limited to "fighting words" as defined in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 86 L. Ed. 1031, 62 S. Ct. 766 (1942), and reaffirmed in *Gooding v. Wilson,* 405 U.S. 518, 523, 31 L. Ed. 2d 408, 92 S. Ct. 1103 (1972), namely:

> [T]hose [words] which by their very utterance inflict injury or tend to incite an immediate breach of the peace.

Sydor was approximately 100 feet away from the defendant and clearly heard this vulgarity."

X.

"[A]t this point the defendant continued yelling and screaming further obscenities, . . ."

XII.

"[T]he crowd . . . was generally antagonistic and hostile."

XV.

"That the utterances made by the defendant were made with the intent to incite others to disorder or riot."

XVI.

"That the public peace and safety was threatened by or at the time of the utterances by the defendant."

XVII.

"That there existed at that time a dangerous assemblage."

The use of such words is an exception to the free speech provisions of the first amendment to the United States Constitution, and made applicable to the states by the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940); *Chaplinsky v. New Hampshire, supra; Gooding v. Wilson, supra; Lewis v. New Orleans,* 415 U.S. 130, 39 L. Ed. 2d 214, 224, 94 S. Ct. 970 (1974). Consequently, the issue presented to this court for decision is whether the words spoken were "fighting words" as defined by the United States Supreme Court.

The record makes it clear that there was no yelling from the crowd *prior* to defendant's arrest; nor is there any evidence that *prior* to the arrest the crowd was hostile or antagonistic to the police (findings of fact Nos. 6, 10). Further, there is no evidence with respect to the loudness of defendant's voice *prior* to his arrest; although, following the arrest, Officer Jennings, instead of Officer Sydor, as found in finding of fact No. 7, heard the defendant's voice when he was 100 feet away (findings of fact Nos. 7, 10). The evidence does support the finding of shouting from the crowd and profanity from the defendant after his arrest during the officers' efforts to subdue him. *Prior* to the arrest when Officer Sydor attempted to move the crowd back onto the sidewalk, they offered no resistance nor were they hostile.

Significantly, Officer Clark's decision to request the defendant to follow him to the police station was made *prior* to the time that defendant used any vulgarity. Up until that time, he had been cooperative with the officer. Officer Clark's decision to go to the police station was based upon his belief that it was not a good "idea to stay in the area due to the traffic hazards the citizens were causing and the possible explosiveness of the situation with the amount of kids." It was not based upon anything defendant had done or said that would tend to incite an immediate breach of the peace. After defendant was advised of Officer Clark's decision, he pronounced the vulgarity for which he was

promptly arrested. There is no testimony that this vulgarity had any effect upon the people who had ventured to the scene. Nor is there any testimony that the utterances were made with an intent to incite others to disorder or riot (finding of fact No. 15). To the contrary, Officer Clark testified that the arrest was made only because he believed it to be a crime to utter the words involved.

In *Lewis v. New Orleans, supra,* the court held a New Orleans ordinance unconstitutional on its face where it was declared a misdemeanor to address vulgarities to a police officer in the performance of his duties. In essence, the court held that the spoken word, unless limited to "fighting words," as defined in *Chaplinsky* and *Gooding,* cannot be prohibited because of the First Amendment right of free speech.

On the record before us in the instant case, there is no evidence to establish that the words spoken by the defendant had any effect or tended in any manner to injure anyone or incite an immediate breach of the peace. As the court said in *Pasco v. Dixson, supra* at 521:

> The record is devoid of proof that this remark was made with design or intent to create a public disturbance or to offend other occupants of the park—except perhaps the police officers who testified they were not offended—or to disturb others in the quiet enjoyment of the park or that the remark would tend to produce any of such consequences, for no evidence was presented from which a public disorder, disturbance or even commotion could be inferred . . . Nor does the record show the offensive language to have been used in such a loud, repetitious or persistent manner as to amount to a disorder in and of itself.

Consequently, we are constrained to reverse the trial court's conviction of the defendant for disorderly conduct and by reason thereof the conviction for resisting arrest must also be reversed. A citizen has the right to resist an unlawful arrest so long as that resistance is reasonable in light of all the circumstances. *State v. Rousseau,* 40 Wn.2d 92, 241 P.2d 447 (1952). No issue is presented on

this question because the city attorney conceded that if the arrest was invalid, the conviction for resisting arrest must also fail.

This court does not by this decision intend to place its stamp of approval upon the words spoken by the defendant; to the contrary, defendant's profanity offends our sense of common decency and is abhorrent to the respect that should be given a law enforcement officer acting in good faith in the performance of his duties. Were it not for *Lewis v. New Orleans, supra,* and the authorities cited therein, and *Pasco v. Dixson, supra,* we would affirm. As Justices Blackmun, Burger and Rehnquist observed in Blackmun's dissenting opinion in *Lewis v. New Orleans, supra* at 141, quoting from *Chaplinsky v. New Hampshire, supra:*

> It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'

As so often happens, hindsight shows that had cooler heads prevailed among all of the participants, this case would never have resulted in a statistic for three levels of courts—particularly in light of the fact that defendant was not in fact the driver of the vehicle.

It becomes unnecessary to reach the issue of the constitutionality of the ordinance; however, in view of the language in *Gooding v. Wilson, supra,* and *Lewis v. New Orleans, supra,* the City of Kennewick may be well advised to review the provisions of its disorderly conduct ordinance, *Pasco v. Dixson, supra,* notwithstanding.

Reversed.

MUNSON, J., concurs.

McINTURFF, J. (concurring)—I also dislike the words which were spoken to an officer of the law carrying out in good faith what he perceived his duty. However, I agree with the majority in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942); *Lewis v. New Orleans*, 415 U.S. 130, 135, 39 L. Ed. 2d 214, 220, 94 S. Ct. 970 (1974); and *Pasco v. Dixson*, 81 Wn.2d 510, 503 P.2d 76 (1972). The words of Justice Powell in his concurring opinion in *Lewis* are apropos:

> The words may well have conveyed anger and frustration without provoking a violent reaction from the officer. Moreover, as noted in my previous concurrence, a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." 408 U. S. 913. See Model Penal Code § 250.1, Comments 4 (Tent. Draft No. 13, 1961).

Other than the "fighting words" exception discussed in the above case, I am reluctant to place any further restriction on the freedom of speech guaranty in the constitution of our great country. My feelings are best expressed by Voltaire: "I disapprove of what you say, but I will defend to the death your right to say it."

I concur in the result.