[No. 3761-4-III.   Division Three.   January 7, 1982.]

THE STATE OF WASHINGTON, *Respondent*, v. TOM W. YOAKUM, *Appellant*.

*Terry L. Karro*, for appellant.

*Douglas S. Boole, Prosecuting Attorney*, and *Mark E. Beam, Deputy*, for respondent.

GREEN, J.—Defendant, Tom Yoakum, was charged with disorderly conduct in violation of RCW 9A.84.030.[1] This

---

[1]That statute states:

"(1) A person is guilty of disorderly conduct if he:

"(a) Uses abusive language and thereby intentionally creates a risk of assault;

. . ."

charge was tried to the court sitting without a jury. At the close of the State's evidence, Mr. Yoakum moved to dismiss the charge contending the State had failed to present a prima facie case. On denial of this motion, defendant rested and the court found him guilty as charged. Mr. Yoakum appeals.

The sole issue is whether there was sufficient evidence to sustain the conviction.

The record shows that about 4:15 a.m. on January 20, 1979, defendant entered the clerk's office of the Okanogan County Sheriff demanding to know if his girlfriend was there. He was told she had just been booked into the jail and bail had been set. He then demanded to "know who the jerk was who brought her in" and was informed it was Deputy Maxwell. The clerk described Mr. Yoakum as "extremely mad", "obnoxious", "demanding", "loud", and had "liquor on his breath and about him". He was, however, unarmed. Mr. Yoakum proceeded from the booking desk to the captain's office where Deputy Maxwell and Posseman Flagg were located. He "banged" open the door, slamming it against the wall and while standing in the doorway asked Deputy Maxwell if he had arrested his girlfriend. The deputy detected a "very strong odor of intoxicants emanating from Mr. Yoakum." He described Mr. Yoakum as "very belligerent and argumentative" and his "voice very loud". He further stated Mr. Yoakum clenched his fists, referred to the deputy in "vulgar terms, four–letter words", and indicated if the deputy drove into his driveway again he would be killed.

The deputy stated he calmly responded to Mr. Yoakum informing him "he was under the influence of intoxicants and it would be in his best interest if he would contact [the deputy] the following day". He was further advised "any efforts to discuss the matter at this time, due to his irrational state, would be futile and that it would once again be in his best interest to discuss it at a later date". However, the deputy stated during this conversation "Mr. Yoakum would become very angry, red–faced, clenching his fists and hit-

ting one fist into the other hand—open hand—I got the impression that he was so angry at this time that the possibility of an assault was almost imminent. . . . I stood up so as to minimize my vulnerability in the event of an assault."

Upon further attempts to persuade Mr. Yoakum to leave, he began pointing his finger in the deputy's face. The deputy then "informed him that he should leave or he would, or could be, charged with disorderly conduct." He stated Mr. Yoakum then "told me to take off the badge and step outside. He was going to kick the _____ out of me and he threatened to shoot me, referred to me—as I indicated—as numerous four–letter words . . . and that was the verbal exchange on Mr. Yoakum's part as he exited the door". He also testified at one point during the conversation, Mr. Yoakum stated if either the deputy or posseman entered the Twisp feed store where Mr. Yoakum worked, a sack of grain or feed would be thrown in his face.

The described conversation lasted for about 1½ hours before Mr. Yoakum left the sheriff's office. Deputy Maxwell testified he "stayed surprisingly calm" throughout. The clerk confirmed this stating "Gary [Maxwell] was pretty relaxed, just normal standing". On January 22, 2 days after this encounter, Mr. Yoakum was cited for disorderly conduct. Based on the foregoing evidence, he was convicted.

Mr. Yoakum contends the evidence was insufficient to sustain the conviction because the deputy and posseman were not incited to assaultive action, but remained calm throughout the encounter. On the other hand, it is the State's position the evidence was sufficient because the vulgarities used were coupled with assaultive conduct which made a breach of the peace imminent.

█ Speech, although vulgar and offensive, is protected by the first amendment to the United States Constitution, unless the speaker's utterances are "fighting words", *i.e.*, words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942); *Gooding v. Wilson,* 405 U.S. 518, 31 L. Ed. 2d 408,

92 S. Ct. 1103 (1972); *Kennewick v. Keller,* 11 Wn. App. 777, 785, 525 P.2d 267 (1974); *Pasco v. Dixson,* 81 Wn.2d 510, 520, 503 P.2d 76 (1972). "Fighting words"

> have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed." . . . The test is what a man of common intelligence would understand would be words likely to cause an average addressee to fight. . . . Derisive and annoying words can be taken as coming within the purview of the statute as heretofore interpreted only when they have this characteristic of plainly *tending to excite the addressee to a breach of the peace.*

(Italics ours.) *Chaplinsky v. New Hampshire, supra* at 573; *Gooding v. Wilson, supra* at 523. Justice Powell, concurring in *Lewis v. New Orleans,* 415 U.S. 130, 135, 39 L. Ed. 2d 214, 94 S. Ct. 970, 973 (1974) noted:

> [W]ords may or may not be "fighting words," depending upon the circumstances of their utterance. . . . The words may well have conveyed anger and frustration without provoking a violent reaction from the officer. . . . [However] a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." 408 U. S. 913.

Likewise, in *Pasco v. Dixson, supra* at 520, the court stated

> [t]o show a public disorder, actual or threatened, existing or impending, the uttered words must . . . be related to the circumstances in which they were uttered.

The court reversed a conviction for disorderly conduct in that case, noting at page 521:

> The record is devoid of proof that [an obscene comment] was made with design or intent to create a public disturbance or to offend other[s]—except perhaps the police officers *who testified they were not offended . . .*

(Italics ours.) In *Kennewick v. Keller, supra,* we noted the absence of testimony that the vulgarity had any effect upon the people who had gathered.

The usual question in these cases is whether the words spoken, in the context of all the circumstances, tended to

incite the addressees to a breach of the peace. Here, the trial judge concluded it did because Mr. Yoakum's words were coupled with physical actions that caused Deputy Maxwell to assume a defensive stance to protect himself against a possible assault. However, there is nothing in the record indicating *the deputies* were about to initiate an assault upon Mr. Yoakum; instead, Deputy Maxwell stated he remained calm throughout, recognizing Mr. Yoakum was intoxicated and unarmed. Mr. Yoakum left the premises and the encounter ended without incident. It was not until 2 days after the event that he was charged with disorderly conduct. In these circumstances, the words spoken did not *in fact* incite the addressees—the deputy, the posseman, or the clerk—to breach the peace. Consequently, under the cited authorities, we are constrained to hold the proof insufficient to support Mr. Yoakum's conviction of disorderly conduct.[2] As we stated in *Kennewick v. Keller, supra* at 788:

> This court does not by this decision intend to place its stamp of approval upon the words spoken by the defendant; to the contrary, defendant's profanity offends our sense of common decency and is abhorrent to the respect that should be given a law enforcement officer acting in good faith in the performance of his duties. Were it not for *Lewis v. New Orleans, supra,* and the authorities cited therein, and *Pasco v. Dixson, supra,* we would affirm. As Justices Blackmun, Burger and Rehnquist observed in Blackmun's dissenting opinion in *Lewis v. New Orleans, supra* at 141, quoting from *Chaplinsky v. New Hampshire, supra:*
>
> > It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.

---

[2]Respondent argues a posseman should not be held to the same standards as a police officer. However, the posseman did not testify and there is no evidence that he reacted in any way to the incident. In fact, there was testimony that he was mostly standing in the background during the episode and let the deputy handle the situation. Our holding is, therefore, unchanged by his presence.

'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.'

Although Mr. Yoakum may have been guilty of another offense—a question we need not determine—the circumstances here are insufficient to support a disorderly conduct conviction.

Reversed.

McINTURFF, C.J., and PEARSON, J., concur.