# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51818-0-II |
| Respondent, | |
| v. | |
| ROBERT JAMES DAGNON, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, A.C.J. — The trial court found Robert J. Dagnon guilty of second degree malicious mischief and disorderly conduct. Dagnon appeals his disorderly conduct conviction, arguing that there is insufficient evidence to support the conviction. Dagnon also appeals the trial court's imposition of certain discretionary legal financial obligations (LFOs): the criminal filing fee, the court appointed attorney fee, and the deoxyribonucleic acid (DNA) collection fee.

We reverse Dagnon's conviction for disorderly conduct and remand for further proceedings consistent with this opinion.

## FACTS

On August 20, 2017, Dagnon got into a verbal altercation with Cody Muller, an off-duty Department of Corrections (DOC) officer. A short while later, Dagnon was arrested and repeatedly kicked the rear window of the patrol vehicle. Dagnon was charged with second degree malicious mischief and disorderly conduct. Dagnon waived his right to a jury trial.

At the bench trial, Muller testified regarding his contact with Dagnon. Muller testified that he was off-duty during his contact with Dagnon at a bar. During his interaction with Dagnon, Muller asked Dagnon to leave. While at the door, Dagnon said "Here's the door," which Muller took to mean that Dagnon was challenging Muller to physically remove him from the premises. 1 Verbatim Report of Proceedings (VRP) (April 17, 2018) 88-89. Muller remained seated and Dagnon left.

After a couple of minutes, Dagnon came back into the bar and sat down at Muller's table. Muller told Dagnon that he was a DOC officer and that Dagnon would be arrested if he continued to make threats. All Dagnon said to Muller was "I didn't do nothing." 1 VRP (April 17, 2018) 90. Then the bar staff approached, and Dagnon again left the bar.

After a brief time, Muller left the bar. Dagnon approached Muller near Muller's car, but Muller could not specifically remember what Dagnon said to him. Muller stuck his arm out to stop Dagnon, and Dagnon said, "Touch me again and I'm going to f***ing knock you out." 1 VRP (April 17, 2018) 97. After taking a step back away from Muller, Dagnon then said, "Now we can talk like men" and attempted to shake Muller's hand, which Muller declined. 1 VRP (April 17, 2018) 97. Muller's contact with Dagnon was interrupted, which gave Muller the opportunity get in his car and call 911.

During cross-examination, Muller admitted that, because he was a DOC officer, he would not punch someone for using harsh language to him. Muller also admitted that if he did he would likely get into trouble.

After the bench trial, the trial court entered the following findings of fact as to the disorderly conduct charge:[1]

1.4     Muller had been at the Pioneer with Stacy Dagnon, and they were seated towards the back of the bar, when Stacy's brother, Robert Dagnon, the defendant herein, entered the bar.

1.5     Shortly after [Dagnon] arrived, he made a derogatory remark to Stacy, which prompted Muller to ask him to leave.

1.6     [Dagnon] told Muller, while motioning outside, "here's the door."

1.7     Muller took this as an invitation to fight, given the surrounding circumstances in which the statement was made.

1.8     After this encounter, Stacy left the table and went to the bathroom. [Dagnon] re-entered the bar and sat down next to Muller while she was gone.

1.9     Muller identified himself as a Department of Corrections (DOC) Officer (off-duty) and asked [Dagnon] to leave. Muller was able to smell alcohol on [Dagnon's] breath and described [Dagnon's] demeanor as threatening. [Dagnon] did eventually leave the bar.

1.10    Stacy left the bar with a friend, and Muller paid the bill, which took approximately five minutes.

1.11    After leaving the bar and while heading towards his car, Muller observed [Dagnon] several feet away from his vehicle.

1.12    Muller proceeded towards his vehicle, but was eventually contacted by [Dagnon] prior to entering.

1.13    While [Dagnon] was walking towards Muller, his approach became so close that Muller held out his hand to keep [Dagnon] from walking into him.

1.14    [Dagnon] walked into Muller's hand and told Muller that if he touched him again he would "knock him out."

---

[1] Dagnon does not assign error to any of the trial court's findings of fact. Accordingly, the trial court's findings of fact are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

1.15    Muller did not enter his vehicle and kept the car door between he and [Dagnon] because he did not want to risk being assaulted while entering.

1.16    [Dagnon] took one step back and attempted to shake Muller's hand, saying they needed to talk like men.

1.17    At this time, a vehicle being driven by Angie Middleton approached the area, and Middleton got out of the vehicle and started talking to [Dagnon].

1.18    [Dagnon] and Middleton began arguing with each other, which allowed Muller to enter his vehicle and call law enforcement.

Clerk's Papers (CP) 24-25. The trial court concluded that Dagnon was guilty of second degree malicious mischief and disorderly conduct.

At sentencing, the trial court asked Dagnon if he was going to be able to work after being released from jail. Dagnon informed the trial court that he would "absolutely be going to work." 2 VRP (April 25, 2018) at 7. Dagnon also stated that he had an excellent work history and had "plenty of people that would hire [him] right now." 2 VRP (April 25, 2018) at 8. At trial, Dagnon had testified that he was a mechanic and welder.

The trial court entered convictions for second degree malicious mischief and disorderly conduct. The trial court imposed a standard range sentence of 3 months confinement. The trial court also imposed the following LFOs: a crime victim penalty assessment, a criminal filing fee, a court appointed attorney fees, and a DNA collection fee.

Dagnon appeals his disorderly conduct conviction[2] and the imposition of certain LFOs.

ANALYSIS

A.    SUFFICIENCY OF THE EVIDENCE

---

[2] Dagnon does not appeal his conviction for second degree malicious mischief.

Dagnon argues that the evidence was insufficient to support his conviction for disorderly conduct because Dagnon's actions did not create an actual risk of assault. Dagnon does not dispute any of the evidence presented at trial, nor does he challenge the evidence supporting the trial court's findings of fact. Rather, Dagnon asserts that the evidence presented and the facts found by the trial court are legally insufficient to support a disorderly conduct conviction. Specifically, Dagnon relies on *State v. Yoakum*, 30 Wn. App. 874, 638 P.2d 1264 (1982), to argue that he cannot be convicted of disorderly conduct because the trial court did not find that Dagnon's conduct created an actual risk of assault. We agree.

1.    Legal Principles

Evidence is sufficient to support a conviction if, after viewing the evidence and all reasonable inferences in a light most favorable to the State, a rational trier of fact could find each element of the crime proven beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). In claiming insufficient evidence, the defendant admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *Id.* at 106 (citing *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

Generally, "following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *Id.* at 105-06. Unchallenged findings of fact are verities on appeal. *Id.* at 106. Because Dagnon does not challenge any of the trial court's findings of fact, they are verities on appeal. Therefore, our review is limited to reviewing whether the trial court's findings of fact support the legal conclusion that Dagnon is guilty of disorderly conduct. *See Id.* at 105-06.

5

A defendant is guilty of disorderly conduct if he "[u]ses abusive language and thereby intentionally creates a risk of assault." RCW 9A.84.030(1)(a). "Speech, although vulgar and offensive, is protected by the first amendment to the United States Constitution." *Yoakum*, 30 Wn. App. at 876. Therefore, disorderly conduct statutes based on abusive language are constitutionally limited to "fighting words." *Id*.

Fighting words are words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 876. There are three steps to analyzing fighting words: (1) the words must be directed at a particular person or group of persons and there must be an addressee; (2) the words themselves must be personally abusive to the ordinary citizen and commonly known to be inherently likely to provoke violent reaction; and (3) consideration must be given to the context or situation in which the words were expressed. *City of Seattle v. Camby*, 104 Wn.2d 49, 53, 701 P.2d 499 (1985).

In *Yoakum*, the defendant entered a Sheriff's office and was upset because his girlfriend had recently been arrested. 30 Wn. App. at 875. For over an hour and a half, the defendant was belligerent and argumentative with a Deputy and used many "'vulgar terms'" and "'four-letter words.'" *Id*. Although the defendant's conduct caused the deputy to believe that the defendant might imminently assault him, the deputy remained calm throughout the encounter. *Id.* at 876. Division Three of this court reversed the defendant's conviction for disorderly conduct, explaining that

> The usual question in these cases is whether the words spoken, in the context of all the circumstances, tended to incite the addressees to a breach of the peace. Here, the trial judge concluded it did because [the defendant's] words were coupled with physical actions that caused Deputy Maxwell to assume a defensive stance to protect himself against a possible assault. However, there is nothing in

the record indicating the deputies were about to initiate an assault upon [the defendant]; instead, Deputy Maxwell stated he remained calm throughout, recognizing [the defendant] was intoxicated and unarmed. [The defendant] left the premises and the encounter ended without incident. It was not until 2 days after the event that he was charged with disorderly conduct. In these circumstances, the words spoken did not in fact incite the addressees—the deputy, the posseman, or the clerk—to breach the peace. Consequently, under the cited authorities, we are constrained to hold the proof insufficient to support [the defendant's] conviction of disorderly conduct.

*Id.* at 877-78 (emphasis omitted).

The State argues that *Yoakum* does not apply here because Muller was off-duty in a personal, social situation rather than on-duty. The State fails to provide any authority that *Yoakum* applies only to on-duty law enforcement personnel. But even if *Yoakum* applies only to on-duty law enforcement personnel, the record and the trial court's findings of fact fail to support Dagnon's disorderly conduct conviction.

In *City of Seattle v. Camby*, our Supreme Court addressed the issue of fighting words between civilians. 104 Wn.2d at 50. However, a reading of *Camby* does not show that a different analysis than that applied in *Yoakum* is required in determining if there are fighting words between civilians.

In *Camby*, the defendant stated that he would "'kick [the civilian's] a[**]'" invited civilian to "'come outside so I can kick your f[******] a[**]',", and stated that he would "'either get [the civilian] tonight or later'." 104 Wn.2d at 50. Relying on *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942), a case that *Yoakum* also relied on, the *Camby* court held that the addressee's reaction is a criteria to consider the context or situation in which the words are spoken, but the actual situation presented and the specific context must be looked at. *Camby*, 104 Wn.2d at 53-54; *see Yoakum*, 30 Wn. App. at 876-877. In looking at the actual situation presented,

7

the court held that despite defendant's words, "an intoxicated defendant being escorted out of a restaurant by a mild-mannered, unaroused doorman-host with a police officer present" was not a situation in which it was likely that a breach of the peace would occur regardless of the language the defendant was using. *Camby*, 104 Wn.2d at 54.

We do not determine whether Muller should be treated as an on-duty officer or whether Muller should be treated as a civilian because he was off-duty in a social situation because our analysis of the findings of fact does not depend on this distinction. Under both *Yoakum* and *Camby*, the law requires that we look at the situation presented and the context in which the words were spoken to determine whether the evidence was sufficient to support the disorderly conduct conviction. Because the trial court made no findings that there was an actual risk of an assault and the findings the trial court did make do not support the inference that there was an actual risk of assault, the unchallenged findings of fact do not support the conclusion that Dagnon committed disorderly conduct.

2.      Unchallenged Findings of Fact

Dagnon does not challenge any of the trial court's findings of fact. And Dagnon's briefing essentially ignores the applicable standard for reviewing the sufficiency of the evidence and fails to specifically address any deficiencies in the trial court's findings of fact. Therefore, the trial court's findings of fact are verities on appeal. *Homan*, 181 Wn.2d at 106. A review of the trial court's unchallenged findings of fact shows that they are insufficient to support the conclusion that Dagnon is guilty of disorderly conduct.

Here, the trial court found that Dagnon told Muller "here's the door" after Muller asked him to leave the bar. CP at 24. The trial court also found that Dagnon told Muller "he would

'knock him out'" outside the bar. CP at 24. The only finding that the trial court made regarding the effect of Dagnon's conduct on Muller was that "Muller did not enter his vehicle and kept the car door between he and [Dagnon] because he did not want to risk being assaulted while entering," which caused Dagnon to take a step back and "attempt[] to shake Muller's hand, saying they needed to talk like men." CP at 25. The trial court did not find that Dagnon's threats inflicted injury, tended to incite an immediate breach of the peace, or caused any actual risk that Muller was going to assault Dagnon.

Because the trial court did not find that Dagnon's conduct inflicted injury, tended to incite an immediate breach of the peace, or created a risk of assault, and the findings do not support even an inference that Dagnon's words met the standard for fighting words, the trial court's findings of fact are insufficient to support the conclusion that Dagnon is guilty of disorderly conduct. Therefore, based on the trial court's unchallenged findings of fact, we reverse Dagnon's conviction for disorderly conduct and remand for the trial court to vacate the conviction.[3]

B.      CHALLENGED LFOS

Dagnon also argues that we should apply the 2018 legislative amendments to the LFO statutes to his appeal and, as a result, we should strike the criminal filing fee, the court appointed attorney fees, and the DNA collection fee. The State argues that Dagnon is not indigent as defined by the statute and, therefore, the trial court properly imposed the criminal filing fee and the court

---

[3] Dagnon's disorderly conduct conviction resulted in a sentence of 90 days served concurrently with Dagnon's three month sentence for the second degree malicious mischief conviction. And Dagnon's disorderly conduct conviction did not affect Dagnon's offender score or standard sentencing range for his second degree malicious mischief conviction. Because vacation of Dagnon's disorderly conduct conviction does not affect the sentence on the remaining charge—second degree malicious mischief—remand for resentencing is unnecessary.

appointed attorney fees. The State concedes that the DNA collection fee should be stricken because Dagnon's DNA has already been collected.

RCW 10.01.160(3)[4] states,

The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent as defined in RCW 10.101.010(3)(a) through (c). In determining the amount and method of payment of costs for defendants who are not indigent as defined in RCW 10.101.010(3)(a) through (c), the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

RCW 10.101.010(3) provides,

"Indigent" means a person who, at any stage of a court proceeding, is:
(a) Receiving one of the following types of public assistance: Temporary assistance for needy families, aged, blind, or disabled assistance benefits, medical care services under RCW 74.09.035, pregnant women assistance benefits, poverty-related veterans' benefits, food stamps or food stamp benefits transferred electronically, refugee resettlement benefits, medicaid, or supplemental security income; or
(b) Involuntarily committed to a public mental health facility; or
(c) Receiving an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level.

Here, Dagnon simply asserts that he was indigent at the time of sentencing and, therefore, the trial court erred by imposing costs. However, Dagnon does not demonstrate that he was indigent as defined in RCW 10.101.010(3)(a)-(c). There is no evidence in the record that establishes that Dagnon is receiving any of public benefits identified in the statute. And Dagnon is not involuntarily committed to a public mental health facility. Finally, there is nothing in the record that establishes Dagnon's annual income is 125% or less of the federal poverty level.

---

[4] Under *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018), the legislative amendments to the LFO statutes apply to Dagnon's appeal.

Dagnon does not even argue that he meets any of the statutory criteria for indigency in RCW 10.101.010(3)(a)-(c).

Instead, Dagnon relies on the fact that he was represented by appointed counsel at trial and on appeal. However, the legislature specifically excluded "[u]nable to pay the anticipated cost of counsel for the matter before the court because his or her available funds are insufficient to pay any amount for the retention of counsel" from the criteria to establish indigency when imposing costs. RCW 10.101.010(3)(d). Under the statutory construction rule of expressio unius est exclusio alterius, the legislature's decision to omit the standard for appointing counsel should be considered intentional. *See State v. Bacon*, 190 Wn.2d 458, 466-67, 415 P.3d 207 (2018). Therefore, receiving the services of appointed counsel is not sufficient for establishing indigency that precludes the imposition of costs under RCW 10.01.160(3).

Because Dagnon did not establish that he was indigent under RCW 10.01.160(3) at the time of sentencing, the trial court could impose costs after considering the financial resources of the defendant and the nature of the burden that payment of costs will impose.[5] Therefore, the trial court did not err by imposing the criminal filing fee and court appointed attorney fees as costs.

However, RCW 43.43.7541 provides,

Every sentence imposed for a crime specified in RCW 43.43.754 must include a fee of one hundred dollars unless the state has previously collected the offender's DNA as a result of a prior conviction.

---

[5] Dagnon does not argue that the trial court abused its discretion by imposing discretionary costs for any reason other than Dagnon's presumed indigency.

No. 51818-0-II

The State concedes that Dagnon's DNA has already been collected based on his prior convictions. Therefore, we reverse the imposition of the DNA collection fee and remand to the trial court with instructions to strike the $100 DNA collection fee from Dagnon's judgment and sentence.

We reverse Dagnon's disorderly conduct conviction and the imposition of the DNA collection fee, and remand to the trial court to dismiss with prejudice Dagnon's disorderly conduct conviction and strike the imposition of the DNA collection fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, A.C.J.
Lee, A.C.J.

We concur:

_____
Worswick, J.

_____
Melnick, J.

12