# IN THE COURT OF APPEALS OF IOWA

No. 19-1257
Filed June 17, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**ROY ALLEN DOORENBOS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Poweshiek County, Shawn R. Showers, Judge.

        A defendant appeals his convictions for assault with intent to commit sexual abuse and simple-misdemeanor assault.  **AFFIRMED.**

        Matthew M. Boles and Adam C. Witosky of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann LLP, Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

        Considered by Tabor, P.J., and May and Greer, JJ.

**TABOR, Presiding Judge.**

The State charged Roy Doorenbos with one count of sexual abuse in the third degree and two counts of assault with intent to commit sexual abuse. The trial information alleged each offense occurred on a different day but against the same victim. A jury acquitted Doorenbos on the sexual abuse count but convicted him of assault with intent and the lesser-included offense of simple-misdemeanor assault. He appeals the two convictions, alleging he is entitled to a new trial because the verdicts were inconsistent. He also contends his trial was unfair because the court did not permit him to view his accuser's mental-health records, declined to strike two jurors for cause, and granted the State's motion to amend the dates in the trial information. Finally, Doorenbos alleges he should be resentenced because the court considered improper information.

On the first issue, we find no inconsistency in the verdicts. Likewise, we see no error in the court's rulings on the privilege issue, jury selection, or the amendment of the trial information. On the sentencing claims, we discern no abuse of discretion. Thus, we affirm the convictions.

## I.     Facts and Prior Proceedings

Graduated from college and somewhat at loose ends, M.A.—then twenty-five years old—moved in with Doorenbos[1] and his wife in Grinnell in May 2016. They had been long-time family friends to the point M.A. considered them to be surrogate parents. M.A. was slow to unpack, considering the stay to be temporary until she landed what she considered her "career job" as a teacher. A few months

---

[1] Doorenbos is a medical doctor who had a family practice in Grinnell for more than three decades. His career is most pertinent to the sentencing issues he raises.

later, she started teaching at a Christian school. But because the pay was low, M.A. continued to live in the Doorenbos home.

Also that summer, M.A. started seeing therapist Brandon Davis. She was feeling "a bit of instability" and thought he could help her develop greater strength in her emotions and relationships. After several months of therapy, M.A. felt like Dr. Davis had "opened up some conflicts" she had been holding inside.[2] In her terms, "it's kind of like when you clean the house, and it get messy before it gets cleaned." That winter, M.A. confided in Doorenbos that she was struggling with thoughts of suicide. In response, he "put his arm around [her] and was crying a little bit and prayed with [her]."

Starting then, their relationship changed. Doorenbos sought her out all over the house for prayer sessions. During these interactions, he would drape his arm over her shoulders or squeeze her hand, which evolved into holding her thigh. M.A. testified, "I was a newish Christian, and he's a well-established Christian and he's a Catholic, and I wasn't a Catholic. So I sort of was wondering for a long time . . . if the touching was like a part of prayer that I didn't know about yet." On occasion, he would come into her bedroom in the early morning hours, ostensibly to pray with her.

By March 2017, according to M.A., the visits grew more invasive. She told the jury that just after midnight on March 9, Doorenbos came into her bedroom. His wife was out of town. At first he sat on the edge of M.A.'s bed. He asked her

---

[2] Before trial, defense counsel moved for access to M.A.'s privileged records kept by Dr. Davis. After an August 2018 hearing, the district court reviewed the records in camera. The court found no basis for disclosure.

if she liked hugs. She said yes. Doorenbos then asked M.A. to tell him something she had never told her therapist. She felt uneasy about his commanding tone. When she hesitated to answer, he said: "As of right then I was officially an adopted member of the Doorenbos family, and as such, daughters obey their fathers, and he wanted me to tell him something that I had never told my therapist."

She eventually shared some personal information with him. In response, he climbed under the covers with her. M.A. said she "froze" and pulled her body away. He scooted her back to the center of the mattress. Then he started to slide his hands under her pajamas. She started to cry. When Doorenbos finally left her bed that morning, M.A. grabbed her phone from the dresser and texted her therapist to schedule an appointment.

After going to work and attending her late afternoon therapy appointment, M.A. was reluctant to return to the Doorenbos home. She did so after midnight on March 10. As she feared, Doorenbos returned to her room and said: "We forgot to pray for you." They went downstairs to the living room where she settled into an armchair. Doorenbos perched on the ottoman. He grabbed her wrists and pulled her forward. After the prayer, he told her, "Okay back to bed." He continued to pull her upstairs by the wrists. At her bedroom door, she broke away and went to shower. After her shower, she went to the attic and dressed. It was still too early in the morning to leave for work so she laid down on a twin bed shoved against a dormer. The attic was cold, so she burrowed under a stack of blankets.

She testified Doorenbos followed her to the attic and pinned her under the covers. She tried to push him off the bed and told him to stop. She described his actions as more aggressive than the night before. She testified he was on top of

her and grabbed her inner thigh with his hand. As she struggled to breathe under his weight, he shifted off her body and started snoring. When the sun started to rise, he walked out of the attic without saying anything. Terrified by what happened, M.A. skipped work but went for another therapy session.

M.A.'s testimony did not end there. She told the jury Doorenbos came to her bedroom again five days later. She testified she had not been sleeping well and felt exhausted. She recalled wearing layers of clothes to bed as a defense mechanism. She alleged Doorenbos kneeled beside her bed and prayed the rosary. After that, according to M.A., Doorenbos forced her to engage in two different sex acts before leaving the room. M.A. testified that she went to therapy the next day and then moved out of the Doorenbos home.

The State offered evidence that Doorenbos contacted M.A. the next day. At 1:53 a.m. on March 16, he texted, "You ok? Out late on a school night!" She responded that she had let his wife know that she was staying with friends. He texted back, "Ok. We miss you and love you! Running away—Running away, huh?" At 10:20 a.m. Doorenbos texted, "[M.A.] don't refuse me! Your Heavenly Father." He sent two more texts that day saying "I'll be at your side" and "I will be with you always! Jesus." She finally responded: "These aren't helping me; please don't." In his final message, he told her, "I'll shut up but I won't give up."

M.A. waited until August before reporting Doorenbos's assaults to police. She went to the station with Dr. Davis, her therapist. After the police took her complaints, she received an email from Doorenbos. He wrote: "I am sorry for having hurt you. You trusted me and I failed you. Please forgive me." M.A. sent

an email of her own, asking Doorenbos questions about his conduct. A few days later, he responded:

> [M.A.] my clearest understanding is that I gave in to temptation. You were distressed with thoughts of suicide, and, believe it or not, I was actually praying for you, but there was something ugly working inside me at a deeper, unacknowledged level which sexualized my behaviors, completely overriding any good intentions. It is obvious, looking back on it now, but at the time I hid that ugliness from myself. God (and I) condemn my behavior. Being with God is not a once-and-done thing. God's presence is sometimes close and sometimes distant. Evil is always lurking, ready to fracture the Kingdom, and I've been given the task of resisting it. My failure to do so is fully my responsibility.

He sent a third email asking her to forgive him.

Doorenbos took the stand in his own defense. He was sixty-four at the time of trial in April 2019. He admitted having an encounter with M.A. in February 2017 when he "stretched out beside her on the bed" and gave her a hug. He acknowledged being "under the covers" and touching "her thigh" and "her belly." He testified that he did not intend to make M.A. feel uncomfortable and didn't consider the contact inappropriate at the time. Doorenbos testified the events M.A. recounted from March "simply didn't happen." On cross examination, he acknowledged going into M.A.'s bedroom to pray with her when she was "restless" or having nightmares. He also admitted having "sexual thoughts" toward M.A. Recalling the time he got under the covers with M.A., he testified, "[I]t's one of those things you look back on and say oops."

The jury considered three offenses: two counts of assault with intent to commit sexual abuse for the March 9 and 10 incidents and one count of sexual abuse in the third degree for the March 15 encounter. The jury returned a verdict of not guilty on the sexual-abuse charge. The verdict was guilty for the March 9

offense of assault with intent and guilty of the lesser-included offense of simple assault for the March 10 offense. The defense moved for a new trial, alleging—among other things—that the jury returned inconsistent verdicts. The defense also renewed its call for access to M.A.'s mental-health records.

The district court denied the new trial motion. In doing so, it declined to reverse an earlier ruling denying release of M.A.'s privileged records. The court imposed a term of incarceration not to exceed two years on the assault with intent and thirty days on the simple assault, to run concurrently. Doorenbos now appeals those two convictions and his prison sentence.

## II. Analysis

### A. Inconsistent Verdicts

Doorenbos claims his acquittal on the count of third-degree sexual abuse amounts to "an inherent finding by the jury that [M.A.] was not credible." From there, he contends the jury reached inconsistent verdicts in believing M.A.'s testimony and convicting him on the other two counts. Because his claim of inconsistent verdicts "is affected by strong constitutional currents," it calls for de novo review. *See State v. Halstead*, 791 N.W.2d 805, 808 (Iowa 2010).

Doorenbos alleged inconsistent verdicts in his motion for new trial. The State contends that was too late. In the State's view, Doorenbos had an obligation to flag any apparent inconsistency before the district court dismissed the jury so the court could have sent the case back for more deliberations. *See State v. Merrett*, 842 N.W.2d 266, 273 (Iowa 2014) (noting procedure under Iowa Rule of Criminal Procedure 2.22(6) for asking jury to reconsider its verdict). Against the State's position, our supreme court has reached the issue of inconsistent verdicts

when raised in a motion for new trial. *See Halstead*, 791 N.W.2d at 807 n.1 (noting State conceded error preservation). We do the same here, opting to reach the merits of Doorenbos's claim.

When we examine jury verdicts for inconsistency, we ask whether the verdicts are "so logically and legally inconsistent as to be irreconcilable within the context of the case." *See State v. Fintel*, 689 N.W.2d 95, 101 (Iowa 2004). In context, the verdicts here addressed three separate offenses alleged to have occurred on three different days. Unlike many inconsistent verdict challenges, these offenses had no overlapping elements and did not involve any predicate crimes or special interrogatories. *See, e.g.*, *Halstead*, 791 N.W.2d at 807–08. The only common denominator among these three offenses was M.A.'s testimony. Doorenbos seizes on that testimony, asserting if the jury disbelieved her about the sexual abuse, it could not believe her about what happened on the other two days.

While it may be surprising for jurors to credit only part of a witness's testimony, that is their function. *See State v. Phanhsouvanh*, 494 N.W.2d 219, 223 (Iowa 1992) (holding "jury could believe all, some, or none of the testimony of the witnesses"). We cannot speculate why the jury believed M.A.'s version of the March 9 incident and to some extent her account of the March 10 event but rejected her allegations about March 15. *See Halstead*, 791 N.W.2d at 815 (declining to open "Pandora's box by probing into the sanctity of jury deliberations"). Because it was possible for Doorenbos to commit two assaults on two different days but not commit sexual abuse on a later date, the jury's verdicts were neither factually nor legally inconsistent.

### B.    M.A.'s Therapy Records

Doorenbos next challenges the district court's denial of his request to discover M.A.'s therapy records.  This challenge calls for a hybrid standard of review.  We review de novo those issues resting on a due process right to present a defense; we review any nonconstitutional challenges to discovery rulings for an abuse of discretion.  *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013).

In June 2018, Doorenbos sought disclosure of M.A.'s privileged records under Iowa Code section 622.10(4)(a)(1) and (2) (2017).  The motion asserted that M.A. "waived the confidentiality privilege to certain treatment records maintained by her psychologist, Brandon Davis."  It also alleged "a reasonable probability that the treatment records of Davis may be exculpatory to [Doorenbos] on the present charges."  The State resisted disclosure.  In September 2018, the district court ruled M.A. had not waived the confidentiality in her privileged counseling records.[3]  But the court did order the State to produce M.A.'s mental health records for an in camera review.  After the in camera review, the court ruled "the records submitted could fairly be characterized as incriminatory, rather than exculpatory."  Thus, the court declined to disclose the records to Doorenbos under section 622.10(4)(a)(2)(d).

We turn to that statute.  Generally, a "mental health professional" cannot "disclose any confidential communication properly entrusted to the person in the person's professional capacity" that was "necessary and proper to enable the person to discharge the functions of the person's office according to the usual

---

[3] The court did find M.A. waived privilege "as to what was actually said to the police" when Dr. Davis was present and in statements M.A. made to another third party.

course of practice or discipline." Iowa Code § 622.10(1). This statutory privilege "shall be absolute with regard to a criminal action." *Id.* § 622.10(4)(a). This means the district court cannot "authorize or require the disclosure of any privileged records to a defendant in a criminal action." *Id.*

That said, two exceptions exist. First, a defendant may discover privileged records upon showing the privilege holder voluntarily waived confidentiality. *Id.* § 622.10(4)(a)(1). Second, a defendant can discover privileged records upon "demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case." *Id.* § 622.10(4)(a)(2)(a). If the defendant satisfies the threshold showing for the second exception, the district court must "conduct an in camera review of such records to determine whether exculpatory information is contained in such records." *Id.* § 622.10(4)(a)(2)(b). "If exculpatory information is contained in the records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder." *Id.* § 622.10(4)(a)(2)(c).

As a prelude, Doorenbos renews his claim of waiver. *See* Iowa Code § 622.10(4)(a)(1) (allowing defendant access in a criminal case when the "privilege holder voluntarily waives the confidentiality privilege); *State v. Leedom*, 938 N.W.2d 177, 189 (Iowa 2020). He contends any communication between

Dr. Davis and M.A. about her plans to involve police are outside their therapeutic relationship.[4] Doorenbos cites no authority for that contention.[5]

We see no reason why a discussion between a patient and a mental health professional about reporting a crime would act as an implicit waiver of privilege. For privilege purposes, the definition of mental health professionals includes psychologists, like Dr. Davis. *See* Iowa Code § 622.10(7). The practice of psychology means "the application of established principles of learning, motivation, perception, thinking, and emotional relations" to the problems of behavior adjustment and includes "counseling and the use of psychological remedial measures" with persons who have adjustment or emotional problems in personal relationships. *See id.* § 154B.1(6). Nothing in that definition forecloses a psychologist from promoting the cathartic or protective value of a patient contacting law enforcement as a part of the counselor's efforts to remedy the patient's emotional problems.

Doorenbos also claims M.A. waived privilege by testifying that she told her therapist about being assaulted. But his claim is not well developed. That

---

[4] These therapy records are distinct from statements M.A. made to the police in Dr. Davis's presence. As noted above, the district court aptly determined those statements were not privileged. *See State v. Randle*, 484 N.W.2d 220, 221 (Iowa Ct. App. 1992) (reiterating "information communicated to a third party who is not within the scope of the privilege destroys the confidential nature of the disclosures and renders them admissible").

[5] Doorenbos refers only to the general proposition that courts strictly construe privileges under section 622.10 because they impede the "full and free discovery of the truth." *See In re A.M.*, 856 N.W.2d 365, 373 (Iowa 2014). Yet even that proposition is wobbly. *See Slaughter v. Des Moines U. College of Osteopathic Med.*, 925 N.W.2d 793, 802 (Iowa 2019) (citing case law construing section 622.10 liberally to carry out the purpose of promoting "free and full communication" between a patient and therapist).

testimony did not reveal the substance of M.A.'s diagnosis or the therapist's treatment advice. Nor did it place her mental health at issue in the prosecution. We thus conclude that testimony did not reveal any intent by the witness to forsake her right to confidentiality in her therapy records. *See generally Leedom*, 938 N.W.2d at 189 (finding accuser did not waive privilege by giving deposition testimony); *see also People v. Silva*, 782 P.2d 846, 850 (Colo. App. 1989) (holding victim's testimony during direct examination by prosecutor did not waive her privilege). We will not find a right "as valuable as a psychotherapist privilege" to be "waived by implication except under the clearest of circumstances." *See State v. Heemstra*, 721 N.W.2d 549, 560 (Iowa 2006), *superseded by statute on other grounds as stated in Leedom*, 938 N.W.2d at 190. M.A.'s testimony was not such a clear circumstance.

Having rejected Doorenbos's waiver argument, we turn to his suspicion that M.A.'s therapy records contain exculpatory evidence. The legislature did not define "exculpatory" in section 622.10. So our supreme court stepped into the breach, giving the term its "ordinary" meaning: "Exculpatory evidence tends to 'establish a criminal defendant's innocence.' *Exculpatory Evidence*, *Black's Law Dictionary* (11th ed. 2019)." *Leedom*, 938 N.W.2d at 188 (entertaining notion that "exculpatory" includes impeachment evidence).

On appeal, Doorenbos argues: "Any divergence between what [M.A.] told Dr. Davis on the days she claims abuse and what she testified to during trial is an avenue to impeach her credibility." To advance that argument, Doorenbos appears to agree with the State that we should perform our own in camera review

of the therapy records released by Dr. Davis.[6]  *See State v. Retterath*, No. 16-1710, 2017 WL 6516729, at *12 (Iowa Ct. App. Dec. 20, 2017) (noting our appellate review of confidential information as provided for in section 622.10(4)(a)(2)(a)).

Like the district court, we reviewed progress notes recorded by Dr. Davis, spanning M.A.'s therapy sessions from March 2017 until June 2018.  And like the district court, we find that privileged information is not exculpatory for Doorenbos.  We thus affirm the district court's denial of his request for access to M.A.'s therapy records.

### C.    Jury Selection

Doorenbos moved to strike two potential jurors for cause because they revealed that they had close relatives who had been victims of sexual abuse.  The district court denied those motions.  "The district court is vested with broad discretion in such rulings."  *State v. Jonas*, 904 N.W.2d 566, 571 (Iowa 2017).  We reverse only upon finding an abuse of that discretion.  *Id.*

The first motion to strike was against panelist F.  He revealed during jury selection that his teenaged granddaughter recently reported a sexual assault to Grinnell police.  Panelist F. was not a witness in his granddaughter's case.  Defense counsel asked panelist F., "Are you able to sit in a case that is a sex assault case—does not involve a minor, but is a sex assault case in your current

---

[6] Doorenbos also disparages the statute's reliance on judges, rather than advocates, to "keep their eyes peeled for exculpatory material" in the mental health records—echoing sentiments in our unpublished decision in *State v. Barrett*, No. 17–1814, 2018 WL 6132275, at *3 (Iowa Ct. App. Nov. 21, 2018).  But our supreme court found the structure of section 622.10 met constitutional standards.  *See Thompson*, 836 N.W.2d at 490.  And we have no authority to detour from the statutory scheme.

state of mind, as you say that this has happened two weeks ago?" He answered, "I believe I can, yes."

The second motion involved panelist B. During jury selection, he told the lawyers, "I believe you asked a question about knowing people that have been sexually [abused], and both my mother-in-law was sexually abused by her father and my wife was sexually assaulted by a church worker at one of her previous jobs." He then described those situations. The prosecutor asked, "Do you feel like you could be fair and impartial and kind of put those incidents aside and evaluate the evidence as it comes in in this case?" Panelist B. responded it would be "hard" and he did not know what his opinion would be. The prosecutor followed up, "Do you think you could at least evaluate this case and then render your verdict based upon that, not based on what happened with your wife or your mother-in-law?" He answered, "I believe I probably could."

Doorenbos challenged those two panelists for cause. *See* Iowa R. Crim. P. 2.18(5)(k) (allowing party to lodge challenge for cause if panelist formed or expressed "an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the trial"). The district court denied the challenges. Later, the court refused the defense request for additional peremptory challenges to replace those used on panelists B. and F.[7]

---

[7] On appeal, the State and Doorenbos filed a joint stipulation clarifying the record on the parties' exercise of peremptory strikes. Because the record did not include the sheet where the parties recorded their strikes, they compared notes and agreed the defense exercised its first peremptory strike against panelist F. and its seventh strike against panelist B. The stipulation states that panelist F. would have

Now Doorenbos argues the district court abused its discretion in not striking these panelists for cause. As to panelist F., Doorenbos claims the grandfather's situation qualifies as a for-cause challenge.[8] *See State v. Hatter*, 381 N.W.2d 370, 372 (Iowa Ct. App. 1985) (holding district court should have sustained challenge for cause to panelist who was rape victim in jury selection for sexual abuse prosecution). As to panelist B., Doorenbos contends the details of the assaults on his family members "overlap" with the circumstances of the case. Plus, he urges the prosecutor's attempts to rehabilitate panelist B. did not succeed. The defense insists panelist B. equivocated too much in his response that he "probably could" render a verdict based on the evidence and not his personal experiences.

In response, the State takes a two-prong approach. First, the State contends the district court properly exercised its discretion in denying the challenges for cause. The State disputes the applicability of *Hatter*, because panelist F. was not himself a rape victim. *See id.* Addressing the other challenge, the State asserts panelist B. did not express a fixed opinion on the merits of the case. *See State v. Hardin*, 498 N.W.2d 677, 682 (Iowa 1993). Second, the State argues—in any event—Doorenbos cannot show he was prejudiced by the rulings. In support of that second argument, the State points to the requirement that a defendant must "specifically ask for an additional peremptory challenge of a

---

been a juror and panelist B. would have been an alternate if not removed by peremptory strikes.

[8] Doorenbos draws analogies to rule 2.18(5)(d) and (m) in his appellant's brief. Paragraph (d) allows a challenge for cause if the panelist is related to the complainant in the prosecution. Paragraph (m) allows a challenge for cause if the panelist is a complainant against this defendant or another person indicted for a similar offense. These analogies, raised for the first time on appeal, do not show the district court abused its discretion in denying his motions to strike for cause.

particular juror after exhausting his peremptory challenges under the rule."[9] *Jonas*, 904 N.W.2d at 583. In a separate argument, the State contends Doorenbos suffered no prejudice from the denial of his motion to strike panelist B. because he would have been seated as an alternate if not removed by a peremptory strike.

We need not reach the State's second argument on prejudice because we find no abuse of discretion in the court's denial of these challenges for cause. Foremost, neither panelist expressed an opinion about Doorenbos's guilt. And unlike the potential jurors in *Jonas*, these panelists did not express bias against Doorenbos based on his race, ethnicity, sex, or sexual orientation. *See id.* at 575. At most, these panelists revealed their relatives had experienced sexual abuse, the subject of the prosecution. Familiarity with the trial topic is different from a bias against the defendant or a preconceived view of his guilt. *See State v. Marcus*, 34 N.W.2d 179, 181 (Iowa 1948) (holding "juror is not disqualified from trying a person accused of a particular crime by the fact that he has a prejudice against such crime, if the prejudice is not such as to influence his verdict").

Here, neither panelist articulated a firm belief their family's exposure to sexual abuse would prevent them rendering their verdict based on the evidence presented. The record did not show heavy-handed efforts to rehabilitate these panelists. Instead, the prosecutor appropriately asked the panelists if they could set aside their own experiences to do their jobs as jurors. *See State v. Walters*,

---

[9] In reply, Doorenbos points out the State did not make this argument in response to his motion for new trial. Without that argument, he asserts the State did not preserve this argument for appeal. *See DeVoss. v. State*, 648 N.W.2d 56, 63 (Iowa 2002). Because we don't reach the prejudice question, we need not consider the effect of *DeVoss* on the State's position.

426 N.W.2d 136, 139 (Iowa 1988) (quoting *Irvin v. Dowd,* 366 U.S. 717, 723 (1961) (holding it sufficient that juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court")). The district court properly exercised its discretion in denying the challenges for cause.

### D.    Amended Trial Information

In his next assignment of error, Doorenbos seeks a new trial based on the district court's grant of the State's motion to amend the timeframes alleged in its trial information. A court may order such an amendment "to correct errors or omissions in matters of form or substance." Iowa R. Crim. P. 2.4(8). But the court must deny the motion to amend "if substantial rights of the defendant are prejudiced by the amendment, or if a wholly new and different offense is charged." *Id.* According to *State v. Maghee*, the rule suggests two levels of review,

> The first part of the rule is discretionary: the district court *may* order amendment so as to correct errors or omissions that either are or are not substantive. Iowa Code § 4.1(30) (provides that word "may" in statute confers a power). Our review up to this point of the rule is therefore for abuse of discretion . . . .
> The second part of the rule limits the district court's discretion: [t]he district court must not allow the amendment if the amendment prejudices substantial rights of the defendant *or* the amendment charges a wholly new or different offense. Thus, our review is for correction of errors at law for this part of the rule.

573 N.W.2d 1, 5 (Iowa 1997). Doorenbos floats a third standard of review. He claims our review is de novo because the amendment violated his right to due process. Doorenbos did not frame the issue in constitutional terms at trial. So we review for legal error on whether the amendment prejudiced his substantial rights. *See id.*

In its original trial information, the State alleged that count 1, third-degree sexual abuse, occurred "on or about March 15, 2017." The date for count 2, assault with intent, was "on or about March 9, 2017." The date for count 3, assault with intent, was "on or about March 10, 2017." Those charges went before a jury in December 2017. But the district court declared a mistrial after M.A. referred to the "felony" charge being filed first. In April 2019, six days before the retrial, the State moved to amend the dates in the trial information. Doorenbos objected.[10] But the court approved the amendment. The amended trial information alleged all three counts occurred "on or between March 1, 2017, and March 31, 2017."

"An amendment prejudices the substantial rights of the defendant if it creates such a surprise that the defendant would have to change trial strategy to meet the charge in the amended information." *Id.* at 6. The district court held the State's amended trial information did not prevent Doorenbos from receiving a fair trial. The court noted he did not ask for a continuance. It also found "the range of dates did not affect the elements of the offense." We find no error in the district court's calculus.

Doorenbos did not assert an alibi or similar defense, which depended on proof that he could not have committed the alleged assaults on specific dates. *See State v. Young*, 172 N.W.2d 128, 129–30 (Iowa 1969) (finding no error in amending dates in indictment). Plus, M.A. testified to the specific dates when she alleged the assaults occurred. Given her specificity, the record does not support Doorenbos's claim that the amendment hindered his defense. *See State v. Bell*,

---

[10] The State insists Doorenbos did not preserve error on this claim. The record shows otherwise.

223 N.W.2d 181, 185 (Iowa 1974) (explaining dates fixed in indictment are not material).

### E.    Sentencing

In his final claim, Doorenbos alleges the district court abused its discretion in imposing an indeterminate two-year prison sentence.  Doorenbos believes he is entitled to a deferred judgment.   He also asks for resentencing because the presentence investigation (PSI) report contained two improper influences: (1) information about the sexual abuse count that led to an acquittal and (2) interjections from M.A.'s victim impact statement of "unproven allegations, hearsay, speculation," and a sentencing recommendation.

The district court's sentencing decisions are "cloaked with a strong presumption in their favor."  *State v. Phillips*, 561 N.W.2d 355, 357 (Iowa 1997). We review them for an abuse of discretion.  *State v. Guise*, 921 N.W.2d 26, 30 (Iowa 2018).   An abuse occurs if the sentencing court exercises its discretion based on untenable reasons.  *Id.*  If the sentencing court misapplies the law, its ruling is untenable.  *Id.*  If the evidence supports the sentence, the district court did not abuse its discretion.  *Id.*

We start with the claim of improper sentencing considerations.  To be sure, Doorenbos's counsel made extensive arguments at the sentencing hearing outlining what the defense believed were impermissible considerations in the PSI and victim impact statement.  In response, the sentencing court said it would "only consider information as it relates to the charge of assault with intent to commit sexual abuse and assault.  The Court is not considering any unproven offenses or risk assessment tools used by the Department of Corrections."   We take the

sentencing court at its word that it did not consider the unproven offense. *See State v. Hansen*, 344 N.W.2d 725, 730 (Iowa Ct. App. 1983).

As for the victim impact statement, Doorenbos claims that the form filled out by M.A. and her letter to the court went beyond the limits outlined in Iowa Code section 915.21(2). That provision allows victims to file a statement describing the impact of the crime, including their economic loss, physical injury, change in their personal welfare or family relationships, and psychological services sought. Iowa Code § 915.21(2)(a)–(d). The section closes with a catch-all provision, permitting "any other information related to the impact of the offense upon the victim." *Id.* § 915.21(2)(e).

Doorenbos asserts M.A.'s impact statement included information outside the statutory bounds.[11] In particular, he points to her "speculation as to abuses by Dr. Doorenbos against hypothetical patients." He also contends the statement impermissibly recommended that Doorenbos "should be punished for continuing to assert his innocence" and presenting himself as the victim. On this last point, Doorenbos highlights the following passage from the sentencing court:

> I have considered the immense harm that you have done to the victim in this case, and I just want to make the record clear because it would be confusing if I didn't for anybody at this hearing. You are not the victim in this case. The victim in this case is [M.A.]. You assaulted her.

---

[11] In his appellant's brief, Doorenbos cites federal authority holding it is improper for a victim impact statement to offer a sentencing recommendation. *See, e.g.*, *Williams v. Norris*, 612 F.3d 941, 952 (8th Cir. 2010) (citing *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991)). Those cases involve capital sentencing hearings and alleged violations of the Eighth Amendment to the U.S. Constitution. They do not apply to Doorenbos's state statutory challenge to his indeterminate two-year prison sentence.

Faced with these assertions, we must decide whether Doorenbos has made an affirmative showing that the district court relied on improper considerations in determining his sentence. *See State v. Sailer*, 587 N.W.2d 756, 762 (Iowa 1998) (placing burden on defendant to overcome presumption the sentencing court properly exercised its discretion). After reviewing the sentencing hearing, we "discern no reliance on improper factors." *See Phillips*, 561 N.W.2d at 359 (upholding sentence despite reference by victim's father to "sexual predators" in his oral victim impact statement). In fact, as discussed above, the district court made clear it was only considering information related to the two crimes for which the jury convicted Doorenbos.

As for the court's reminder that Doorenbos was not the victim, we do not read that passage as a direct reflection on M.A.'s victim impact statement. Rather, the defense presented information to the sentencing court portraying Doorenbos as the aggrieved party. For instance, defense counsel argued Doorenbos had faced enough consequences, including the inability to continue his medical practice: "For two years he has suffered that fate." Similarly, in his allocution, Doorenbos said, "It has been a hard couple of years for me."

And the defense presented two dozen character-reference letters to the sentencing court. The letters included opinions such as his "career has been completely destroyed by these accusations," "these accusations and guilty conviction have resulted in him losing his medical career," "he has suffered more than enough," "he has already paid a hefty price," "it makes my heart hurt that a person could spread lies about another person and be able to get away with it," and he "has already suffered the public humiliation of the one-sided press

coverage of this situation."  The district court did not abuse its discretion by refocusing the attention on the harm suffered by M.A.  *See Sailer*, 587 N.W.2d at 761 (declining to "further victimize the victim, by forcing his or her impact statement to conform to a rigid legal standard instead of allowing an unabridged expression of the impact of the offense").

Having found no affirmative showing that the district court relied on impermissible factors, we turn to Doorenbos's contention that the prison sentence was unreasonable under the prescribed statutory factors.  Those factors include the defendant's age, prior record, employment circumstances, family circumstances, mental-health and substance-abuse history, the nature of the offense, and other appropriate factors.  Iowa Code § 907.5(1).  In our review, we recognize the sentencing court may not focus on the nature of the offense alone in determining the appropriate punishment.  *State v. Hopkins*, 860 N.W.2d 550, 555 (Iowa 2015).  "On the other hand, the seriousness and gravity of the offense is an important factor."  *Id.*

Let's look at the district court's reasoning:

Mr. Doorenbos, I have considered all of the sentencing options provided for in Chapters 901 and 907 of the Iowa Code.  My judgment relative to sentence is based on what will provide maximum opportunity for your rehabilitation and at the same time protect the community from further offenses by you and deter others and yourself in the future from committing these sexually-motivated offenses and the simple assault offense.  In selecting a sentence for you, I have considered your age.  I have considered your prior criminal history, which you are first-time offender, but you are not a youthful offender, and in that distinction I make the distinction that you were experienced in life to know the difference between right and wrong.

The court also stated it was considering Doorenbos's employment history. From there, the court addressed his need for rehabilitation. The court noted Doorenbos has "obviously done a lot of good things" in his life. Against those "honorable things," the court balanced Doorenbos's conduct as determined by the jury's verdicts. "A father figure, a doctor, and a religious mentor to this young woman, you took advantage of her, and this is the sort of behavior that has to be deterred." The court told Doorenbos, "Your position in the community and letters of support don't give you the license to do this."

Sentencing courts may appropriately consider a defendant's professional status. *See State v. Pappas*, 337 N.W.2d 490, 495 (Iowa 1983). And a sentencing court may refuse probation when it would "unduly depreciate the seriousness of the crime." *State v. Morrison*, 323 N.W.2d 254, 256–57 (Iowa 1982). Melding those two concepts, we have long held "the punishment must fit the particular person and circumstances under consideration." *See State v. McKeever*, 276 N.W.2d 385, 387 (Iowa 1979). The court's reasons here comply with that mandate. Thus, we find no abuse of discretion in the court's rejection of Doorenbos's request for a deferred judgment and imposition of a prison sentence.

**AFFIRMED.**